2001 UT 58

**STATE of Utah, Plaintiff and Appellee,**

v.

**David E. MEAD, Defendant and Appellant.**

No. 981866.

Supreme Court of Utah.

July 10, 2001.

Mark L. Shurtleff, Att'y Gen., Marian Decker, Asst. Att'y Gen., Salt Lake City for plaintiff.

Ronald J. Yengich, Vanessa Ramos–Smith, Salt Lake City, for defendant.

DURRANT, Justice:

¶ 1 A jury convicted David Mead of murder, a first degree felony, in violation of section 76–5–203 of the Utah Code, and criminal solicitation, a second degree felony, *see* Utah Code Ann. § 76–4–204 (1995); Utah Code Ann. § 76–5–203(2) (Supp.1998), in violation of section 76–4–203. Mead appeals his convictions, alleging numerous errors at trial. We affirm.

## BACKGROUND

¶ 2 "We relate the facts in the light most favorable to the jury's verdict." *State v. Litherland*, 2000 UT 76, ¶ 2, 12 P.3d 92.

### I. PAMELA MEAD'S DEATH

¶ 3 Several neighbors heard screaming from the backyard of David and Pamela Mead's house just after 11:00 p.m. on the evening of August 15, 1994. At least two people called 911, and Michael Marsh, a neighbor, went to the Meads' house to investigate. Marsh found David Mead in the house, inconsolable. Mead rushed him to the unlit backyard. Another neighbor, Scott Christianson, ran into the backyard at the same time with a flashlight. Christianson and Marsh discovered Pamela Mead's lifeless body lying on the ground next to a crudely constructed fish pond. She had white foam coming from her nose and mouth that hampered Marsh's futile attempts to resuscitate her. All the while, David Mead was screaming, "You've got to help her!" Following Marsh's failed efforts at resuscitation, Mead leapt into the fish pond and angrily began to dismantle it, yelling that it had killed his wife. Officers Sam Tausinga and Michael Jensen of the Salt Lake City Police Department arrived and attempted to calm Mead. Eventually, they removed him from the pool, handcuffed him to keep him under control, and had him sit in their police car.

¶ 4 The fish pond was four to eight feet across and three to three and a half feet deep. It was surrounded by a two to three foot loose brick collar and was lined with black polyethylene. Mead had begun building the pond in the late spring or early

summer of 1994; however, it took some time to complete. Marsh had provided the bricks for the collar only two or three weeks prior to Pamela Mead's death, and, at the time of Pamela Mead's death, there was a fresh pile of excavated dirt still beside the pond. The pond had been filled with water only about four days earlier.

## II. INVESTIGATION

¶ 5 Initially, the death was treated as an accident. Mead told the police that he had gone to work at the Salt Lake City Airport at about 8:30 p.m. and checked in at about 8:50 p.m. with a security guard.[1] He stated he had told his wife to feed the fish in the pond while he was at work, and, when he returned home, he found her floating in the fish pond, dead. Several weeks before her death, Pamela Mead had surgery to remove bunions on both feet. The surgery required her to wear medical sandals, which she was wearing when she drowned. The surgery also made walking difficult and left her unsteady on her feet. In light of Pamela Mead's surgery and the story David Mead related to them, investigators concluded Pamela Mead had fallen on the brick lining near the pond and accidentally drowned.

¶ 6 Because the pond was treated as the scene of an accident rather than a homicide, the police tape was removed when the officers left later that night. By the next afternoon, the pool was gone. It had been filled in, and Marsh saw two of David Mead's brothers working in the backyard that day, smoothing over the area where the pond had been.

### A. Autopsy

¶ 7 Dr. Todd Grey, Chief Medical Examiner of the Office of the Medical Examiner for the State of Utah, performed the autopsy on Pamela Mead. Dr. Grey found a large amount of foam coming out of Pamela Mead's nose and mouth, "a mixture of water, air, and the fluid that actually lines the inside of the air spaces of the lungs" and is not uncommon in drowning. She had a laceration on the back of her head that occurred "paramortem," i.e., at or around the time of death. There was also a vertical series of abrasions on the right side of her abdomen and an abrasion on her right elbow. These injuries also occurred at or around the time of death. The blow to the back of the head was upwards. Dr. Grey opined that "whatever caused this injury had a fairly distinct and relatively sharp edge to it" and that the injury could have been caused by a brick like those surrounding the pool.

### B. Certification of Death

¶ 8 After performing the autopsy, Dr. Grey concluded Pamela Mead had fallen on the bricks surrounding the pond. He certified the cause of her death as "drowning" and the manner of her death as an "accident." Dr. Grey made the death certificate on August 16, the day after Pamela Mead's death. That same day, Kevin Harris, one of the Meads' neighbors, went into the Meads' backyard to examine the floodlights, because he had noticed on the night of Pamela Meads' death that the lights were not working. He discovered the lights were functional, but the bulbs had simply been unscrewed. Also that day, John Mead, David Mead's brother, contacted Allstate Insurance Company both to inquire about Pamela Mead's policy and to make certain no one else could receive information regarding the policy.

¶ 9 After discussing the information available to the police with Detective Jill Candland, who oversaw the investigation of Pamela Mead's death, Dr. Grey amended the certification as to the manner of Pamela Mead's death to "pending investigation." He amended the certificate on August 19, three days after his initial certification.

### C. Mead's Inculpatory Statements

¶ 10 The subsequent police investigation revealed several earlier statements by David

---

**1.** Mead's claim that he was at work was partially confirmed by Chris Ahearn, the Police Liaison Officer to the Salt Lake City Airport, who testified that Mead's presence at the airport sometime on the date Pamela Mead died had been verified by the computer access security system. However, Ahearn did not testify as to Mead's presence at any particular time on the date of his wife's death.

Mead implicating him in his wife's death. On separate occasions, Mead had spoken with three people, Winneteka Walls, Stormy Simon, and Mead's cousin, James Hendrix, about killing his wife. During the two years immediately prior to Pamela Mead's death, David Mead had been having an affair with Walls. Walls wanted Mead to leave his wife and threatened to reveal the affair to Pamela Mead if he did not. Several weeks before the drowning, Mead told Walls that he wished his wife were dead and that his wife was going to have an "accident." Specifically, he said she would have a "nasty spill," and, when she did, he would have an alibi.

¶ 11 Mead also had an affair with Simon, then an exotic dancer, in either 1991 or 1992. The affair ended abruptly, however, when Simon discovered Mead was married. Nevertheless, the two remained in contact, and, in a 1993 telephone conversation, Mead told Simon he was unhappy in his marriage. Simon advised him to get a divorce. He told her he could not do so, however, because he would lose his business to Pamela Mead and her family.[2] Instead, he said he would be better off killing his wife and getting the insurance money. Apparently, Pamela Mead was listening to the conversation on another extension. She became upset and left her husband for a time, living with her family in Colorado.

¶ 12 Mead also made inculpatory statements to his cousin, James Hendrix. Hendrix was released from prison in June or July 1994. After his release, he met with Mead, who gave him a "present," a $100 bill wrapped around a piece of rock cocaine. The next day, Mead gave him more cocaine and about $900. At that time, Mead asked him to kill Pamela Mead, offering him $30,000 or $40,000 in exchange. David and Pamela Mead had purchased a life insurance policy in December 1993, that provided each of them a $250,000 death benefit, and an additional $250,000 accidental death benefit. Mead told Hendrix the money for killing his wife would come from these proceeds. When Hendrix asked Mead if the police would suspect Mead in his wife's death, he responded,

"for the last year[ ] he had been the perfect husband."

¶ 13 Detective Candland learned of the statements Mead made to Walls and Hendrix. She presented Walls's and Hendrix's statements to Dr. Grey. Relying on these statements, Dr. Grey certified the manner of death as "homicide" on September 28, 1994.

¶ 14 Several months later, in 1995, Mead sought out Simon, with whom he had an affair before Pamela Mead's death, at her workplace. He told her his wife had died in a "mysterious freak accident" and that investigators were looking for Simon. He told her not to speak with them and asked if she recalled the telephone conversation wherein he told her he would be better off killing his wife and getting the insurance money. She responded that she did. He told her he did not. Mead then asked her if that was something she felt she would have to admit in court. She said it was. Simon felt intimidated by Mead during the conversation.

¶ 15 Additionally, an apparent discrepancy surfaced in Mead's alibi. Robert Elliot, who worked for Mead at Valley Ground Service, claimed that he had been working on the night Pamela Mead died, arriving at about 9:00 p.m. and leaving after 10:00 p.m., and that he did not see Mead or any other Valley Ground Service employees that night.

## III. CIVIL AND CRIMINAL TRIALS

¶ 16 Pamela Mead's family filed a wrongful death action in federal court against Mead to obtain the proceeds of Pamela Mead's $250,000 life insurance policy. That trial resulted in a hung jury, and Mead and Pamela Mead's family reached a settlement.

¶ 17 Following the civil trial, Mead was charged with murder and criminal solicitation, the two charges to be tried together. Prior to trial, Mead filed a motion to sever the counts, which the trial court denied. Mead also requested that the trial court circulate a pre-trial questionnaire to potential jurors to determine if there was any potential bias or prejudice as a result of the "extensive pre-trial publicity" regarding both

---

2. Mead ran a business called Valley Ground Service that was actually held in Pamela Mead's name. Valley Ground Service provided cleaning services for airlines at the Salt Lake Airport.

the case and the related civil wrongful death action. Out of this same concern, Mead requested individual, in camera voir dire for each potential juror with prior knowledge of the case. The trial court denied both the request for a jury questionnaire and the request for individual, in camera voir dire. However, the trial court did state its willingness to conduct individual, in camera voir dire if the need arose.

¶ 18 During voir dire, the trial court asked whether the potential jurors had any prior knowledge of the case. Several potential jurors admitted they did and related they had heard of the case through media reports. The trial court asked if this prior knowledge would affect their ability to be fair and impartial. Two potential jurors admitted it would. At a later point in voir dire, Mead's counsel asked the trial court for permission to ask individual follow-up questions relating to prior knowledge of the case. The trial court rejected this request, stating its belief that many of the potential jurors who admitted having prior knowledge of the case, in fact, knew very little of the case from the media reports. Instead, the trial court reiterated the question of whether prior knowledge of the case would affect any potential jurors' ability to be fair and impartial. The same two potential jurors again admitted it would, and neither sat on the jury that convicted Mead, one being dismissed by a peremptory challenge and the other dismissed for cause. However, two other potential jurors who admitted to having prior knowledge of the case, but who asserted they could be fair and impartial, ultimately sat on the jury that convicted Mead.

¶ 19 At trial, Mead's neighbor, Marsh, testified that he initially believed Mead was innocent and that the Meads seemed to be happily married. After being asked if he had changed his mind about Mead's innocence, Marsh stated, "I changed my mind insofar as I no longer have a certainty of his innocence and I'm more than willing to wait out the process to see things-." Mead's counsel objected, and the trial court ordered the answer be stricken.

¶ 20 Hendrix testified at trial that Mead had passed a polygraph test, but that Mead had told him he had studied books so he would pass. Hendrix also testified that Mead solicited him to kill Pamela Mead only a couple of weeks before Pamela Mead's death. Following the solicitation, Hendrix went "on a drug-induced 'bender' for a couple of weeks." On regaining control of his faculties, he learned of Pamela Mead's death. He also learned Mead was staying with family. Taking advantage of this knowledge, Hendrix broke into Mead's house twice to steal money. About a month after Pamela Mead's death, Hendrix again broke into Mead's house, and robbed Mead at gunpoint while Mead was in bed with Walls. Hendrix was arrested and charged with three counts of burglary, two counts of aggravated robbery, various gun charges, and interfering with arrest. Hendrix entered a plea bargain allowing him to serve only a few months in jail.

¶ 21 Detective Candland interviewed Hendrix in the Davis County Jail before he entered this plea bargain. She testified that she did not promise Hendrix leniency or talk to the prosecutor. However, she did write a letter to the board of pardons on Hendrix's behalf after he entered his plea bargain. Hendrix also testified that he was not promised leniency in exchange for his testimony against Mead.

¶ 22 Anne Sultan represented Pamela Mead's family during the wrongful death lawsuit against Mead. At trial, Sultan testified that during settlement negotiations in the civil case, Mead had offered to return Pamela Mead's body to her family in Colorado in exchange for the family's dismissing the lawsuit. She also stated the offer "sent chills down my spine." In his criminal trial, Mead moved for a mistrial on the grounds that the settlement offer in the civil action was inadmissible under rule 408 of the Utah Rules of Evidence and that Sultan's unsolicited comment that the offer "sent chills down my spine" was prejudicial.

¶ 23 At trial, Mead's defense was that Pamela Mead's death had been accidental, that she had been feeding the fish in the pond when the Meads' dog, Baron, knocked her off balance and into the pool where she struck her head on the brick lining and then drowned. Dr. Grey testified the scratches on

Pamela Mead's abdomen were not consistent with the suggestion that they had been caused by the dog jumping up on her.

¶ 24 Mead proposed several jury instructions the trial court refused to give to the jury. Two of these are relevant on appeal. Mead proposed a jury instruction stating that Hendrix, one of the State's key witnesses, had "received certain promises from the prosecutor in exchange for his testimony." Similarly, Mead proposed an instruction stating that the testimony of Hendrix, Simon, and Walls regarding Mead's inculpatory statements about killing his wife could only be considered as "circumstantial evidence of motive and intent" and not to show that Mead acted in conformity with these statements.

¶ 25 Following deliberations, the jury convicted Mead of murder and criminal solicitation. Mead appeals.

## DISCUSSION

¶ 26 Mead alleges numerous errors on appeal. He contends (1) the trial court abused its discretion in refusing his request for a jury questionnaire and/or in camera voir dire; (2) the trial court abused its discretion in refusing his request for follow-up questions to the jury panel regarding their prior knowledge of the case; (3) the trial court committed reversible error in admitting improper expert testimony from Dr. Grey, the medical examiner; (4) the trial court committed reversible error in allowing Sultan to testify as to statements Mead made during settlement negotiations in the federal wrongful death case; (5) the trial court abused its discretion in refusing to allow Mead to call a rebuttal witness; (6) the trial court committed reversible error in allowing Marsh to testify as to his opinion of Mead's guilt; (7) the trial court committed reversible error in denying Mead's motion to sever the murder count and the criminal solicitation count; (8) the trial court committed reversible error in admitting improper prior "bad act" evidence; (9) the trial court committed reversible error in failing to give the jury an instruction Mead had requested; (10) the cumulative effect of these errors warrants reversal; and (11) the

evidence presented at trial was insufficient to convict him beyond a reasonable doubt.

## I. VOIR DIRE

¶ 27 Mead contends the trial court committed reversible error during voir dire. Specifically, he argues the trial court erred in denying his requests for (1) a jury questionnaire; (2) individual, in camera voir dire; and (3) follow-up questions to the jury pool regarding prior knowledge of the case. We review these rulings for an abuse of discretion. *State v. Reed*, 2000 UT 68, ¶ 8, 8 P.3d 1025. " '[W]hether the court abused its discretion [in determining the scope of voir dire] turns on whether, considering the totality of the questioning, counsel was afforded an adequate opportunity to gain the information necessary to evaluate jurors.' " *State v. Piansiaksone*, 954 P.2d 861, 868 (Utah 1998) (alterations in original) (quoting *State v. Bishop*, 753 P.2d 439, 448 (Utah 1988)).

### A. Jury Questionnaire and Individual In Camera Voir Dire

¶ 28 Mead first argues the trial court abused its discretion by not using a jury questionnaire and/or individual, in camera voir dire to determine jurors' potential biases and prejudices stemming from exposure to prior media coverage of the criminal case and related civil suit in federal court. We disagree.

#### 1. Jury Questionnaire

¶ 29 Mead's proposed jury questionnaire contained the following questions related to pre-trial publicity: (1) "What if anything have you heard about this case?" (2) "What is the source of the information that allowed you to learn about this case?" (3) "Based on what you know about his case, have you formed an opinion about the guilt or innocence of David Mead?" (4) "If yes, please explain."

¶ 30 While electing not to use the proposed jury questionnaire, the court, nevertheless, asked several questions during voir dire re-

lating to pre-trial publicity[3] and allowed Mead's attorney to describe the facts of the case and the related civil lawsuit to the potential jurors. The trial court's questions and Mead's attorney's description of the case prompted several potential jurors to inform the trial court of their exposure to media reports relating to Pamela Mead's death.

¶ 31 While it may be advisable for a trial court to use a jury questionnaire in certain situations, the trial court has "considerable latitude as to the manner and form of conducting the voir dire examination." *State v. Malmrose*, 649 P.2d 56, 60 (Utah 1982). We cannot say the court abused its discretion in the instant case. Indeed, as the questions asked in voir dire were substantially similar to those requested in the proposed jury questionnaire, even were we to assume the trial court erred in failing to use the proposed jury questionnaire, Mead has demonstrated no harm.

2. Individual, In Camera Voir Dire

¶ 32 The trial court denied Mead's request to conduct individual, in camera voir dire with each potential juror who had prior knowledge of the case. However, the trial court did state its willingness to conduct individual voir dire if the need arose. Despite this offer, nothing in the record indicates such a need ever arose. There was, for instance, no suggestion that any particular juror would be reluctant to disclose intimate facts relating to this issue. Further, any suggestion that questions answered in front of the entire panel would taint other potential jurors was weak at best. Additionally, Mead never requested the court conduct individual,

in camera voir dire for any particular, potential juror on any ground. We conclude the court's determination to conduct individual, in camera voir dire only if the need arose fell within its "considerable latitude as to the manner and form of conducting the voir dire examination." *Id.* Accordingly, the trial court did not abuse its discretion.

*B. Follow-up Questions*

¶ 33 Next, Mead argues the trial court abused its discretion in refusing to allow him to ask follow-up questions to the jury regarding prior knowledge of the case. In *State v. Saunders*, 1999 UT 59, 992 P.2d 951, we stated as follows:

We now make emphatically clear that a juror's statement alone that he or she can decide a case fairly pursuant to the law given by the trial court is not a sufficient basis for qualifying a juror to sit when the prospective juror's answers provide evidence of possible bias and the trial court does not allow further questions designed to probe the extent and the depth of the bias. Preventing such further inquiry and concluding the issue by taking a juror's conclusory statement that he or she will not be affected by a particular attitude or will decide the case fairly is not sufficient.

*Id.* at ¶ 36, 992 P.2d 951. As we have previously noted, press coverage may bias potential jurors. *See State v. James*, 819 P.2d 781, 798 (Utah 1991). Accordingly, the potential jurors' answers indicating they had prior knowledge of the case from media reports were "evidence of possible bias." *Saunders*, 1999 UT 59, ¶ 36, 992 P.2d 951. The trial court acted outside its discretion[4] in refusing

---

3. The trial court asked the following questions related to pre-trial publicity: (1) "Do any of you have any knowledge of the facts involved in this case or have you formed or expressed an opinion with regard to those facts, either based upon common notoriety, media reports or general discussion?" (2) "Those of you who have recalled some information about the case, at least as reported in the media, would that experience affect your ability to be fair and impartial if you are selected to serve in this case?" and (3) "Are there any among you as a result of your experience hearing about or reading about these incidents that have formed an opinion that the defendant is guilty as a result of that or that he's not guilty?"

4. We reiterate our concern regarding the description of a trial court as having "abused" its discretion. We use that term interchangeably with phrases such as "exceeded its discretion" and "acted outside its discretion." We commented on this in *Rivera v. State Farm Mutual Automobile Insurance Co.*, 2000 UT 36, ¶ 7 n. 2, 1 P.3d 539:

The phrase "abuse of discretion" has come into common usage in review of judicial proceedings. Although it is seen by appellate courts as an efficient way of describing a more complex concept, it has also come to be seen by many as offensive. The phrase is used here simply to be consistent with prior case law

to allow Mead the opportunity to ask follow-up questions to the members of the jury panel who had prior knowledge of the case.

██ ¶ 34 This does not end the inquiry, however. While the trial court's error hinged on its failure to address the jurors' *"possible* bias," *id.* (emphasis added), to demonstrate reversible error in a matter of jury impartiality, Mead must show he was *actually* prejudiced by the trial court's error. *See id.* at ¶¶ 52–55, 992 P.2d 951. Two of the jurors who convicted Mead had prior knowledge of the case. However, this only demonstrates the possibility of a biased jury, and the possibility of prejudice alone is insufficient. *See id.* We recognize the trial court's refusal to allow follow-up questions precludes Mead from demonstrating that those particular jurors were actually biased due to prior media exposure. Nevertheless, Mead had the burden of at least proffering evidence that media reports prior to trial could have unfavorably biased potential members of the jury, for instance, by presenting false or misleading media reports relating to Pamela Mead's death. Mead has failed to meet this burden. Accordingly, we conclude the trial court's failure to allow follow-up questions exceeded its permitted discretion, but did not amount to reversible error.

## II. MEDICAL EXAMINER'S TESTIMONY

██ ¶ 35 The day after Pamela Mead's death, Dr. Grey, the medical examiner, initially certified the manner of her death as accidental. Three days later, he changed this certification to "pending investigation." After Detective Candland presented him with statements from Walls and Hendrix, Dr. Grey ultimately certified the manner of death as a homicide on September 28, 1994. Mead contends the trial court erred in allowing Dr. Grey to testify at trial regarding his changed opinion. Mead contends (1) the testimony amounted to improper bolstering of Walls's and Hendrix's statements, as Dr. Grey accepted those statements as true in concluding the death was a homicide and (2) Dr. Grey did not rely on valid scientific techniques as required for expert witnesses by rule 702 of the Utah Rules of Evidence.[5] We review the court's decision for an abuse of discretion. *State v. Adams,* 2000 UT 42, ¶ 9, 5 P.3d 642.

### A. Improper Bolstering

██ ¶ 36 "[A]n expert may not testify that what a witness told the expert was the truth," *State v. Kallin,* 877 P.2d 138, 140 (Utah 1994), because "rule 608(a)(1) [of the Utah Rules of Evidence] bars admission of an expert's testimony as to the truthfulness of a witness on a particular occasion." *State v. Rimmasch,* 775 P.2d 388, 392 (Utah 1989). Mead argues Dr. Grey's testimony in this case was an improper commentary as to the truthfulness of Walls' and Hendrix's statements in violation of the rule of *Kallin* and *Rimmasch* proscribing the improper bolstering of witnesses' testimonies. We disagree.

---

regarding the standard of review to be applied to the trial court's actions. When a trial court abuses its discretion, it has exceeded the range of discretion allowed for the particular act under review. When it does not abuse its discretion, it has stayed within the permitted range of discretion allowed. Use of the phrase "abuse of discretion" should not be misread to imply a conscious and intentional violation of the permitted discretion by the trial judge. Although such a willful disregard of the standards to be applied by the trial judge happens occasionally, it is certainly not the rule, and our use of "abuse" of discretion should not be read to imply such wrongful intent. We use [terms such as] "exceed the permitted range of discretion" and "abuse of discretion" interchangeably, meaning to describe exactly the same condition.

5. Mead also appears to challenge the admissibility of the medical examiner's testimony under rule 703 of the Utah Rules of Evidence, which provides, as follows:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

However, Mead only cites to the rule without giving any supporting argument. Further, the contention that the trial court's ruling violated rule 703 was not raised below. Accordingly, we do not resolve it on appeal. *See, e.g., State v. Pledger,* 896 P.2d 1226, 1229 n. 5 (Utah 1995) (declining to address issue raised for the first time on appeal absent contention of "plain error" or "exceptional circumstances").

¶ 37 Dr. Grey testified that he changed his initial *certification* of the manner of Pamela Mead's death from "accident" to "homicide" based on statements from Walls and Hendrix. In other words, his certification only, not his testimony, was partially based on the statements of Walls and Hendrix. Indeed, as elicited on cross-examination, his conclusion at trial was that the physical evidence was consistent with either an accident or a homicide.

¶ 38 *Kallin* and *Rimmasch* are inapplicable to Dr. Grey's reliance on potential witness statements in certifying the manner of death. Those cases apply only to an expert's testimonial conclusions given at trial, in this case, as they relate to the manner of death. Yet, at trial, Dr. Grey did not vouch for the truthfulness of either Walls or Hendrix. Indeed, Mead had a full opportunity to explore the issue on cross-examination, and when Mead's counsel asked Dr. Grey whether he had any knowledge of the truthfulness of Walls's statement, he responded, "No." Accordingly, we conclude Dr. Grey's testimony did not bolster the statements of other witnesses in violation of *Kallin* and *Rimmasch*.

### B. Rule 702

¶ 39 Mead further contends Dr. Grey's testimony regarding changing his certification of the manner of Pamela Mead's death from "accident" to "homicide" was inadmissable under rule 702 of the Utah Rules of Evidence. We disagree.

 ¶ 40 Rule 702 of the Utah Rules of Evidence provides, "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." In deciding whether evidence is admissible under rule 702, Utah courts follow a three-prong test: (1) whether "the scientific principles and techniques underlying the expert's testimony are inherently reliable," *State v. Crosby*, 927 P.2d 638, 641 (Utah 1996), (2) whether "the scientific principles or techniques at issue have been properly applied to the facts of the particular case by sufficiently qualified experts," *id.* (footnote omitted), and (3) whether the evidence is admissible under rule 403 of the Utah Rules of Evidence.[6] *See id.*

 ¶ 41 Mead contends Dr. Grey's testimony was improper as he followed no scientific method in relying on the statements of Walls and Hendrix in changing his certification of the manner of death. Mead's challenge confuses the first and second prongs of the rule 702 admissibility test. At core, Mead's challenge goes to the *application* of the physical evidence to two different proposed sets of facts. On the one hand, absent the statements from Walls and Hendrix, Dr. Grey certified that he would conclude the death was accidental. On the other hand, given the statements from Walls and Hendrix, Dr. Grey certified he would conclude the death was a homicide. This was proper testimony from Dr. Grey. He applied the physical evidence to two potential fact patterns. Further, Mead thoroughly and extensively cross-examined Dr. Grey on this issue; the jury was well aware of the basis for Dr. Grey's changed opinion. Additionally, as noted above, Dr. Grey's ultimate testimony before the jury was that the physical evidence of Pamela Mead's death was consistent with both accident and homicide. Accordingly, the trial court did not err in allowing Dr. Grey to testify as to changing the certifica-

---

6. Rule 403 provides, "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

In *State v. Crosby*, we described the third prong as "whether the proffered scientific evidence will be more probative than prejudicial as required by rule 403." 927 P.2d 638, 641 (Utah 1996). However, *Crosby* was not intended to alter rule 403 determinations in any way. Properly stated, the third prong of the rule 702 admissibility test is whether the probative value of the proffered scientific evidence "is *substantially outweighed* by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Utah R.Evid. 403 (emphasis added).

tion of the manner of death from "accident" to "homicide."

## III. SETTLEMENT NEGOTIATIONS

¶ 42 During trial, the State asked Sultan, the attorney for Pamela Mead's family during the federal wrongful death action, if Mead offered to settle that case. She responded affirmatively. The State then asked, "What did he propose to you?" Sultan responded, over Mead's objection, "He told me that if I dropped the lawsuit, he would return the body to the family. And it sent chills down my spine." The trial court then sustained Mead's objection, and the remark was stricken from the record.

¶ 43 On appeal, Mead contends the trial court erred in allowing Sultan to respond at all to the State's question as Mead's statement to her was made during settlement negotiations. As a statement made during settlement negotiations, Mead argues, his proposal was protected from disclosure in the trial below by rule 408 of the Utah Rules of Evidence.[7] We disagree.

¶ 44 Whether rule 408 applies to statements made during civil negotiations that are sought to be admitted in a criminal trial has not previously been addressed by this court. "When interpreting an evidentiary rule, we apply principles of statutory construction.... Thus, we first look to the plain language of the rule." *Vargas*, 2001 UT 5, ¶ 31, 20 P.3d 271 (citations omitted). Rule 408 provides, "[E]vidence of conduct or statements made in compromise negotiations is ... not admissible." It is unclear whether the rule contemplates this evidence to be inadmissible in only the trial related to the same dispute that is the basis of the compromise negotiations, in all civil trials, or in all trials whether civil or criminal.

¶ 45 As we find the plain language of the rule to be ambiguous, we now turn "to the

interpretations of the federal rules [of evidence] by the federal courts to aid in interpreting the Utah rules." ·*State v. Banner*, 717 P.2d 1325, 1333–34 (Utah 1986). However, the federal courts are split on the issue. *Compare Manko v. United States*, 87 F.3d 50, 54–55 (2d Cir.1996) (finding rule 408 inapplicable in a criminal case as the policy of rule 408, i.e., settlement of civil suits, was outweighed by inclusion of the evidence in a criminal case), *and United States v. Prewitt*, 34 F.3d 436, 439 (7th Cir.1994) (finding that rule 408 does not prohibit the use of statements that were made during civil negotiations in a criminal case involving the same facts), *with United States v. Hays*, 872 F.2d 582, 588–89 (5th Cir.1989) (prohibiting evidence of civil settlement in a criminal case).

¶ 46 We find the Second Circuit's opinion in *Manko* persuasive. In *Manko*, the defendant was convicted of multiple counts of tax fraud. 87 F.3d at 51. The defendant attempted to introduce evidence of a civil settlement with the IRS, which undermined the United States' case as to several counts against him. *See id.* at 52. The trial court found the evidence inadmissible under rule 408. *Id.* The Second Circuit vacated the defendant's conviction under the following rationale:

"Rule 408 is premised on the idea that encouraging settlement of civil claims justifies excluding otherwise probative evidence from civil lawsuits. However, encouraging settlement does not justify excluding probative and otherwise admissible evidence in criminal prosecutions. The public interest in the disclosure and prosecution of crime is surely greater than the public interest in the settlement of civil disputes. It follows that since nothing in the Rule specifically prohibits receiving in evidence the admissions and statements made at a conference to set-

---

7. Although Mead objected on rule 408 grounds below, the trial court did not base its ruling on that specific ground, relying instead on rule 404(b). Relying on the court of appeals' opinions in *State v. Ortiz*, 782 P.2d 959 (Utah Ct.App. 1989), *Broberg v. Hess*, 782 P.2d 198 (Utah Ct. App.1989), *State v. Pacheco*, 778 P.2d 26 (Utah Ct.App.1989), and *Cunningham v. Cunningham*,

690 P.2d 549 (Utah Ct.App.1984), the State contends Mead's claim of error under rule 408 is, therefore, unpreserved for appeal. We reject this view and conclude Mead's raising the issue below in his objection was sufficient to preserve it on appeal. To the extent the above cases are contrary, we decline to follow them.

tle claims of private parties, they are admissible in any criminal proceeding."

*Id.* at 54 (quoting *United States v. Gonzalez,* 748 F.2d 74, 78 (2d Cir.1984)). We agree with this reasoning. The public interest in presenting "probative and otherwise admissible evidence in criminal prosecutions" outweighs "the public interest in the settlement of civil disputes." *Id.* Accordingly, we hold "the admissions and statements made at a conference to settle claims of private parties ... are admissible in any criminal proceeding." *Id.* We reject Mead's claim that Sultan's statement was inadmissible under rule 408.

## IV. REBUTTAL WITNESS

¶ 47 Hendrix testified at trial that Mead had passed a polygraph test, but that Mead had told him he had studied books so he would pass. Mead contends the trial court erred in not allowing him to call a witness to rebut the claim that he had studied to pass the polygraph test by testifying as to the futility of studying to pass a polygraph test. However, Mead provides no record support for the notion that he even intended to call a rebuttal witness. Instead, Mead attached to his appellate brief the affidavit of his attorney at trial below stating he intended to call a rebuttal witness and made his intent known to the trial judge in an unrecorded chambers conference.

■ ¶ 48 The State moved to strike the affidavit, arguing that where a party perceives a gap in the record on appeal it is not simply free to addend documentary evidence to its brief. We agreed and struck the

addendum from the record before oral argument.[8] Accordingly, as there is no record to indicate otherwise, we presume the correctness of the proceedings below and do not address Mead's contention of error. *See State v. Wetzel,* 868 P.2d 64, 67 (Utah 1993).

## V. TESTIMONIAL OPINION AS TO MEAD'S GUILT

¶ 49 Mead contends the trial court erred by allowing his neighbor, Marsh, to testify as to his opinion of Mead's guilt. Specifically, the witness testified at trial that he initially believed the drowning was accidental, but now "I have reconsidered—I was going to say I have changed my mind insofar as I no longer have a certainty of his innocence and I'm more than willing to wait out the process to see things—." The trial court struck the testimony and specifically instructed the jury to disregard it. Additionally, the trial court gave a blanket preliminary instruction to the jury not to consider evidence stricken from the record.

■ ¶ 50 To demonstrate reversible error stemming from the presentation of evidence ruled inadmissible, but cured by either a curative or preliminary instruction, Mead must demonstrate that "there [was] an 'overwhelming probability' that the jury [was] unable to follow the court's instructions, and a strong likelihood that the effect of the evidence [was] 'devastating' to [him]." *State v. Harmon,* 956 P.2d 262, 273 (Utah 1998) (quoting *Greer v. Miller,* 483 U.S. 756, 767 n. 8, 107 S.Ct. 3102, 97 L.Ed.2d 618 (1987)). Mead has failed even to allege that Marsh's testimony meets this standard.[9] We believe

8. We note the proper procedure to add a previously unrecorded proceeding to the appellate record is set forth in rule 11(g) of the Utah Rules of Appellate Procedure. That rule provides as follows:

> If no report of the evidence or proceedings at a hearing or trial was made, or if a transcript is unavailable, or if the appellant is impecunious and unable to afford a transcript in a civil case, the appellant may prepare a statement of the evidence or proceedings from the best available means, including recollection. The statement shall be served on the appellee, who may serve objections or propose amendments within 10 days after service. The statement and any objections or proposed amendments shall be submitted to the trial court for settle-

ment and approval and, as settled and approved, shall be included by the clerk of the trial court in the record on appeal.

Utah R.App.P. 11(g).

9. Instead, Mead argues the statement should have been excluded under rule 701 of the Utah Rules of Evidence. That rule provides, as follows:

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.

the trial court's instructions were sufficient to dispel any prejudice occasioned by the improper statement. "The testimony, while certainly not beneficial to [Mead], was not so prejudicial as to impair a substantial right." *Wetzel,* 868 P.2d at 70. Accordingly, Mead has failed to demonstrate error on this issue.

## VI. JURY INSTRUCTIONS

¶ 51 Mead contends the trial court erred in not providing a jury instruction stating that Hendrix, one of the State's key witnesses, had "received certain promises from the prosecutor in exchange for his testimony." Similarly, Mead alleges the court erred in not providing an instruction stating that the testimony of Hendrix, Simon, and Walls regarding Mead's statements about killing his wife could only be considered as "circumstantial evidence of motive and intent" and not to show that Mead acted in conformity with these statements. "Whether a trial court committed error in refusing to give a requested jury instruction is a question of law, which we review for correctness." *State v. Kruger,* 2000 UT 60, ¶ 11, 6 P.3d 1116. We disagree with both of Mead's allegations of error.

¶ 52 As to the proposed jury instruction regarding prosecutorial promises made to Hendrix in exchange for his testimony, the only uncontested point in this regard was that Detective Candland wrote a letter to the board of pardons on Hendrix's behalf following his plea bargain. Whether Hendrix actually received any promises from the prosecutor in exchange for his testimony was a contested issue at trial. Indeed, Hendrix repeatedly denied any such bargain existed. Thus, Mead's requested instruction would have been an inappropriate commentary on the evidence before the jury. Therefore, the trial court did not deny Mead a fair trial by refusing to give the requested instruction.

¶ 53 The trial court also properly excluded the proposed instruction limiting the scope of the jury's consideration of the statements of Walls, Simon, and Hendrix. First, the evidence that Mead asked Hendrix

Utah R.Evid. 701. This argument merely provides another basis for excluding the testimony.

to kill his wife is direct, not circumstantial, evidence of the solicitation charge. Second, the statements were not admitted solely to show motive and intent. They were also admitted, and properly so, to refute Mead's suggestion that the drowning was accidental and that he had a good relationship with his wife. The court's refusal to allow the instructions was not error.

## VII. SEVERING COUNTS

¶ 54 Before trial, Mead moved to sever the murder and criminal solicitation counts brought against him, claiming they must be tried separately. The trial court denied the motion, ruling the two counts could properly be tried together as they were part of a single criminal episode and Mead "would [not] be unfairly prejudiced by joinder of [the] offenses." Mead contends the trial court erred in failing to sever the counts because (1) the two offenses were not part of a single criminal episode, requiring severance of the counts under rule 9.5 of the Utah Rules of Criminal Procedure, and (2) he was unfairly prejudiced by joinder in violation of section 77–8a–1 of the Utah Code. "A denial of severance will only be reversed by this Court if it is affirmatively shown that a defendant's right to a fair trial has been impaired." *State v. Velarde,* 734 P.2d 440, 445 (Utah 1986) (footnote omitted). We conclude Mead's argument that the two offenses were not part of a single criminal episode is unavailing. We also conclude Mead was not unfairly prejudiced by the joinder of the counts against him.

### A. Rule 9.5(1)(a) of the Utah Rules of Criminal Procedure

¶ 55 Rule 9.5(1)(a) of the Utah Rules of Criminal Procedure provides as follows:

Unless otherwise provided by law, complaints, citations, or informations charging multiple offenses, which may include violations of state laws, county ordinances, or municipal ordinances and arising from a single criminal episode as defined by Section 76–1–401, shall be filed in a single

It does not address the question of prejudice suffered because the jury heard the statement.

court that has jurisdiction of the charged offense with the highest possible penalty of all the offenses charged.

A "single criminal episode" is defined as "all conduct which is [1] closely related in time and [2] is incident to an attempt or an accomplishment of a single criminal objective." Utah Code Ann. § 76–1–401 (1999). Mead contends that the criminal solicitation and murder offenses were not part of the same criminal episode, and, therefore, the trial court erred in failing to separate the two counts against him. We disagree.

¶ 56 There can be no doubt that the solicitation and murder charges share an identical criminal objective: the death of Pamela Mead. As to the timing issue, the murder and solicitation charges represent separate manifestations of Mead's single, ongoing criminal objective. Mead solicited Hendrix to kill his wife several weeks before her actual murder. In light of Mead's overarching scheme to rid himself of his wife, a scheme that covered a period of years, the passage of mere weeks is negligible.[10] Accordingly, the trial court correctly determined the counts were part of a single criminal episode.

■■■ ¶ 57 A further difficulty with Mead's contention is that, even accepting the truth of his argument, i.e., that the two counts were not, as the trial court ruled, part of a single criminal episode, it does not, therefore, follow that the trial court erred in failing to separate the murder and criminal solicitation counts. As the court of appeals has correctly noted, "Rule 9.5 only dictates when informations charging multiple offenses arising from a single criminal episode *must be joined.* It does not address either when the trial court *may join* charges or when charges *must be severed.*" *State v. Scales,* 946 P.2d 377, 384 n. 6 (Utah Ct.App.1997). Accordingly, Mead's contention that the trial court erred in ruling that the two counts were part of a single criminal episode is unavailing.

### B. Section 77–8a–1 of the Utah Code

¶ 58 As stated above, rule 9.5 is irrelevant to the issue of whether a court must sever charges brought against a defendant. This issue is governed, instead, by section 77–8a–1 of the Utah Code. Section 77–8a–1 provides, in relevant part, as follows:

(1) Two or more felonies, misdemeanors, or both, may be charged in the same indictment or information if each offense is a separate count and if the offenses charged are:

(a) based on the same conduct or are otherwise connected together in their commission; or

(b) alleged to have been part of a common scheme or plan.

. . . .

(4) (a) If the court finds a defendant or the prosecution is prejudiced by a joinder of offenses or defendants in an indictment or information or by a joinder for trial together, the court shall order an election of separate trials of separate counts, grant a severance of defendants, or provide other relief as justice requires.

Utah Code Ann. § 77–8a–1 (1999).

■■■ ¶ 59 We begin our analysis by noting that it is uncontested that the murder and criminal solicitation counts were "alleged to have been part of a common scheme or plan." *Id.* § 77–8a–1(1)(b). Accordingly, to demonstrate the trial court abused its discretion in joining the two charges, Mead must show prejudice under section 77–8a–1(4)(a). As the court of appeals has correctly stated, "The initial inquiry regarding whether a defendant is prejudiced by joinder is 'whether evidence of the other crime would have been admissible in a separate trial.'" *State v. Smith,* 927 P.2d 649, 654 (Utah Ct.App.1996) (quoting *State v. Lee,* 831 P.2d 114 (Utah Ct.App.1992)); *see also State v. Saunders,* 699 P.2d 738, 741 (Utah 1985) (determining joinder was unduly prejudicial where evidence of the other crime would not have been

---

**10.** The overarching, single criminal objective of killing Pamela Mead distinguishes this case from prior cases such as *State v. Cornish,* 571 P.2d 577 (Utah 1977), and *State v. Ireland,* 570 P.2d 1206 (Utah 1977). In those cases, the lack of a clear, single criminal objective heightened the necessity of the timing element. Here, as the murder and solicitation charges were manifestations of a single, clear, criminal objective, the timing between the two incidents is not as crucial.

admissible in a separate trial). We conclude the evidence of either crime would be admissible in a separate trial. In a separate trial for murder, evidence of the solicitation charge would be admissible to demonstrate a common plan or scheme. Similarly, in a separate trial for solicitation, evidence of the murder charge would be probative of the earnestness of Mead's request that Hendrix kill his wife. Therefore, we hold the trial court did not abuse its discretion in denying Mead's motion to sever the murder and criminal solicitation counts.

## VIII. PRIOR "BAD ACT" EVIDENCE

¶ 60 Prior to Pamela Mead's death, David Mead told Simon he would be better off killing his wife than divorcing her. Similarly, he told Walls that Pamela Mead was going to have an "accident." Further, Mead asked Hendrix to kill Pamela Mead shortly before her death. Mead contends the court erred in allowing these statements to come before the jury because they constituted prior "bad act" evidence proscribed by rule 404(b) of the Utah Rules of Evidence. We disagree.

¶ 61 For evidence to be admissible under rule 404(b), the trial court must determine the evidence (1) is offered for a proper, non-character purpose, (2) meets the requirements of rule 402, and (3) meets the requirements of rule 403. *State v. Decorso*, 1999 UT 57, ¶¶ 20–23, 993 P.2d 837. "[W]e review a trial court's decision to admit evidence under rule 404(b) ... under an abuse of discretion standard. We review the record to determine whether the admission of other bad acts evidence was 'scrupulously examined' by the trial judge 'in the proper exercise of that discretion.'" *State v. Nelson–Waggoner*, 2000 UT 59, ¶ 16, 6 P.3d 1120 (footnote omitted) (quoting *Decorso*, 1999 UT 57, ¶ 18, 993 P.2d 837).

¶ 62 First, we consider the trial court's decision that the "evidence [was] offered for a proper, noncharacter purpose." *Decorso*, 1999 UT 57, ¶ 20, 993 P.2d 837. Rule 404(b) states, in relevant part, as follows:

Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Utah R.Evid. 404(b). Mead's statements were admissible for multiple, proper, non-character purposes under rule 404(b). They demonstrate he had a motive, plan, and intent to kill Pamela Mead. Thus, the trial court remained within its permitted range of discretion in determining the statements were admissible under the first prong of the rule 404(b) admissibility test.

¶ 63 Next, we review the trial court's decision that the "evidence [met] the requirements of rule 402." *Decorso*, 1999 UT 57, ¶ 22, 993 P.2d 837. Rule 402 requires that evidence be relevant to be admissible. *See* Utah R.Evid. 402. Here, Mead's statements were relevant as they tended to demonstrate Mead had a plan, intent, and motive to kill his wife. Thus, as with the first prong, the trial court remained within its permitted range of discretion in determining the statements were admissible under the second prong of the rule 404(b) admissibility test.

¶ 64 Finally, we review the trial court's determination that the "evidence [met] the requirements of rule 403." *Decorso*, 1999 UT 57, ¶ 23, 993 P.2d 837. Rule 403 provides, "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Utah R. Evid. 403. Mead contends the probative value of the statements was minimal because some of the statements were made over a year before Pamela Mead's death. We disagree. Mead stated to Hendrix shortly before the murder that he, Mead, would not be implicated in his wife's death as he had been the "perfect husband" for the past year. The inference the trial court could easily draw from this is that Mead's earlier statements were a part of a common plan or scheme to kill his wife, but he had simply waited for some time after making them to avoid suspicion. Thus, while

the evidence was prejudicial, it was also highly probative. The danger of unfair prejudice did not substantially outweigh the probative value of the evidence. The trial court's ruling here was well within its permitted range of discretion in admitting the statements under rule 404(b).

## IX. SUFFICIENCY OF THE EVIDENCE

■ ¶ 65 Mead next contends the evidence presented at trial was insufficient to support a finding of guilt beyond a reasonable doubt. We will reverse on this ground " 'only when the evidence . . . is sufficiently inconclusive or inherently improbable that reasonable minds must have entertained a reasonable doubt. . . .' " *State v. Verde*, 770 P.2d 116, 124 (Utah 1989) (quoting *State v. Booker*, 709 P.2d 342, 345 (Utah 1985)) (further quotations omitted). Put another way, we will "overturn a conviction for insufficient evidence when it is apparent that there is not sufficient competent evidence as to each element of the crime charged for the fact-finder to find, beyond a reasonable doubt, that the defendant committed the crime." *State v. Layman*, 1999 UT 79, ¶ 12, 985 P.2d 911.

### A. *Criminal Solicitation Conviction*

■ ¶ 66 As to the criminal solicitation count, Mead argues the evidence presented cannot support the jury's finding of guilt beyond a reasonable doubt because the only evidence to support the jury's verdict is Hendrix's testimony. Mead contends Hendrix's testimony cannot support the verdict because Hendrix purportedly acted as Mead's accomplice, "warranting [that] added scrutiny" be given to his testimony, and because Hendrix "was offered significant favorable treatment for his own numerous criminal problems in exchange for his testimony against [Mead]." We disagree.

■ ¶ 67 Even if we were to accept Mead's contentions, as we recently stated, "we do not sit as a second trier of fact: It is the *exclusive function of the jury* to weigh

the evidence and *to determine the credibility of the witnesses*. So long as there is some evidence, including reasonable inferences, from which findings of all the requisite elements of the crime can reasonably be made, our inquiry stops." *State v. Boyd*, 2001 UT 30, ¶ 16, 418 Utah Adv. Rep. 8 (quotations omitted). In this case, the State presented "some evidence" to satisfy each element of the criminal solicitation count. It is the jury's role to determine the weight and credibility of this evidence. *Id.* Accordingly, Mead has provided us "no reason to second guess" the jury's determination. *Id.*

### B. *Murder Conviction*

■ ¶ 68 We now turn to Mead's contention that the evidence was insufficient to support the jury's finding of guilt beyond a reasonable doubt as to the murder charge. Mere weeks before Pamela Mead's death, David Mead offered Hendrix $30,000 $40,000 to kill her. Further, Mead told both Walls and Simon he would kill his wife, have an alibi, and make it look like an accident. He told Hendrix this would happen after he had played the role of a good husband for a year to allay any suspicions of his involvement. While Mead had apparently been working on the pool for some time, he hastily completed it shortly after Pamela Mead's foot surgery. The backyard lights were in working order at the time of the murder; however, the bulbs had been unscrewed slightly, leaving the backyard dark. Moreover, Mead began dismantling the pool before the police even arrived, and his brothers completed this the next day. Additionally, the allegation that Mead was motivated to kill his wife for the life insurance money was bolstered by Mead's own prior statements and the fact that he began his efforts at recovering the insurance proceeds the day after his wife's death. We conclude there was "sufficient competent evidence as to each element of the crime charged for the fact-finder to find, beyond a reasonable doubt, that the defendant committed the crime." *Layman*, 1999 UT 79, ¶ 12, 985 P.2d 911.[11]

11. Having concluded the only error committed below was the trial court's failure to allow follow-up questions during voir dire, we do not address Mead's contention that the jury verdict should be reversed due to cumulative error.

## CONCLUSION

¶ 69 We find no reversible error occurred in the trial below. Therefore, we affirm the jury verdict convicting Mead of murder and solicitation of criminal homicide.

¶ 70 Chief Justice HOWE, Associate Chief Justice RUSSON, Justice DURHAM, and Justice WILKINS concur in Justice DUR-RANT's opinion.