2010 UT App 209

**STATE of Utah, Plaintiff and Appellee,**

v.

**Grant HILDRETH, Defendant and Appellant.**

**No. 20080615–CA.**

Court of Appeals of Utah.

July 29, 2010.

Rehearing Denied Sept. 27, 2010.

Aaron S. Bartholomew and Carolyn E. Howard, Orem, for Appellant.

Mark L. Shurtleff and Christine F. Soltis, Salt Lake City, for Appellee.

Before Judges DAVIS, McHUGH, and ORME.

## OPINION

DAVIS, Presiding Judge:

¶ 1 Grant Hildreth challenges his convictions for two counts of forcible sexual abuse, a second degree felony, *see* Utah Code Ann. § 76–5–404 (2008). Specifically, he argues that the trial court abused its discretion by denying his motion for severance. We reverse and remand.

## BACKGROUND [1]

¶ 2 Hildreth was a licensed chiropractor practicing in Utah County, Utah. In June 2007, Hildreth was charged by information with eight counts of forcible sexual abuse, *see id.*, in connection with his conduct involving five women he treated as chiropractic patients from 2004 to 2007. Counts I and II pertained to C.W.; Counts III and IV pertained to B.B.; Count V pertained to M.W.; and Count VI pertained to A.W.[2] Prior to trial, Hildreth filed a motion requesting that the trial court sever the counts and hold a separate trial for the counts relating to each alleged victim.[3]

¶ 3 The trial court held a hearing on Hildreth's motion for severance. Ruling from the bench, the trial court denied the motion. Without determining whether a common scheme or plan existed or whether the crimes were connected in their commission, *see* Utah Code Ann. § 77–8a–1(1)(a)–(b) (2008), the trial court reasoned that joinder of the counts was proper because Hildreth would not be prejudiced under rule 404(b) of the Utah Rules of Evidence. Specifically, the trial court concluded that Hildreth would not be prejudiced by denying the motion for severance because under rule 404(b) "the evidence . . . as to one victim would be [ ]admissible as to the others . . . on the issue of absence of mistake, or accident, motive, mental state and plan." *See generally* Utah R. Evid. 404(b) (discussing when evidence of other crimes, wrongs, or acts is inadmissible). The trial court further stated that the "factors that the Court has focused upon in finding that [the evidence] is going to be admissible under 404(b)" included the following: (1) each count involved Hildreth, who "exploited a position of trust as a chiropractor"; (2) each count occurred while Hildreth was providing chiropractic care; and (3) each count happened in Hildreth's office.[4] Aside from these brief comments, the trial court did not otherwise analyze the issue of prejudice, including whether the evidence was relevant, *see id.* R. 401, 402, or whether the evidence would be more probative than prejudicial, *see id.* R. 403.

¶ 4 After the trial court denied the motion, the charges involving B.B., M.W., and A.W. remained joined with those involving C.W. and the case proceeded to trial on all those counts. All four women testified during the State's case-in-chief. Hildreth took the stand and testified in the defense's case-in-chief.

### B.B.'s Testimony (Counts III and IV)

¶ 5 B.B. testified that in June or July 2006, she saw Hildreth for routine chiropractic care. During her second appointment, Hildreth had B.B. get undressed from the waist up and put on a hospital gown. After examining her spine, Hildreth had her lie down on the examination table and then lifted the gown up to her "neck area" so that her bare chest was exposed. B.B. testified that Hildreth felt down her chest and ribs on the right side and "went over the nipple." B.B. testified that after that, Hildreth "pulled [her] pants down just enough to where [her] pubic bone or hair was showing" and "proceeded to with his fingers just feel around on the pubic bone." B.B. testified that during the examination, no one else was in the room.

1. "In reviewing a jury verdict, we view the evidence and all reasonable inferences drawn therefrom in a light most favorable to the verdict. We recite the facts accordingly." *State v. Shepherd*, 1999 UT App 305, ¶ 2, 989 P.2d 503 (internal quotation marks omitted).

2. Counts VII and VIII pertained to conduct involving T.W. The trial court severed these counts because T.W. was unavailable to testify at trial, and the court ultimately dismissed the counts without prejudice. No evidence relating to the dismissed counts was admitted into evidence at Hildreth's trial.

   Hildreth was also charged with witness tampering, *see* Utah Code Ann. § 76–8–508 (2008), in connection with T.W. This charge was also dismissed without prejudice, and Hildreth does not challenge any aspect of this charge on appeal.

3. Hildreth conceded that Counts I and II (C.W.) were properly joined but argued that those counts should be severed from the remaining counts; conceded that Counts III and IV (B.B.) were properly joined but argued that they should be severed from the other counts; and argued that Count V (M.W.) and Count VI (A.W.) should each be tried separately.

4. Count VI occurred at Hildreth's home, which at the time, he used as his office.

B.B. also testified that she did not say anything to Hildreth about the exam making her uncomfortable but that other chiropractors had previously done the same exam and she had "always" had her clothes on. B.B. testified that she saw Hildreth "probably 30, 40 times" after the second visit but usually had her husband with her.

¶ 6 B.B. testified that in February or March of 2007, she returned to Hildreth for another appointment. During her examination, Hildreth mentioned that he had a new ultrasound machine that could help repair the damaged muscle tissue on her back. B.B. testified that she undressed from the waist up and put on a hospital gown. After treating her with the machine, Hildreth had B.B. stand up with her back against his chest so that he could adjust a rib. B.B. testified that as Hildreth was doing the adjustment, he "reached his hand underneath [her] gown and around [her] waist so his hand was actually on [her] breast." This caused B.B. some concern because Hildreth had done this adjustment on her "probably twice" in 2006 and she had always been clothed. B.B. testified that although she went back to Hildreth four or five more times after that, he only did one more rib adjustment, after which she began telling him that she did not have time for that treatment. B.B. testified that she reported Hildreth's conduct to the police after she saw on the news that Hildreth had been arrested.

*M.W.'s Testimony (Count V)*

¶ 7 M.W. testified that in October 2006, she was seven months pregnant and went to see Hildreth for hip pain. M.W. testified that she remained fully clothed during her first appointment and that Hildreth adjusted her hip and then told her that he had an ultrasound machine that would repair any damage to the muscles in that area. After she sat in the chair of the machine, M.W. testified that Hildreth pulled her pants down on the side that was affected and applied the machine and some gel to her hip. M.W. testified that it made her "a little uncomfortable because [she] didn't know that was going to happen." M.W. also testified that she told Hildreth she

was having pain in her shoulder blade. Hildreth had M.W. stand up and lean against him with her back to his chest. Hildreth then put his hand down M.W.'s shirt and under her bra. Hildreth's hand was "skin to skin" with the side of her breast but did not "get down to the nipple area." M.W. stated that they were alone in the examination room but that the door to the room was open. On her way out of the office that day, M.W. made a follow-up appointment.

¶ 8 M.W. testified that she saw Hildreth again the following week.[5] After the same hip adjustment and machine treatment, Hildreth offered to give M.W. a massage specifically designed for pregnant women. M.W. agreed. Hildreth took her to another room, handed her a gown, and told her to undress completely from the waist down, leaving the gown open in the front. M.W. did so. When Hildreth returned, he instructed M.W. to get on the examination table and lay down flat on her back. He then opened up the gown and tucked the bottom of her shirt up into her bra, completely exposing her naked body from the waist down. Using lotion, Hildreth then began to massage her hip and buttocks. At one point, M.W. "could feel [Hildreth] lifting up [her] back side" and "could feel [her] cheeks separating." M.W. testified that Hildreth also touched her pelvic area. M.W. "felt very, very uncomfortable" and "couldn't believe this was happening to [her]," but didn't cry out because she "just wanted it to be over." After the massage was over, Hildreth left the room and M.W. got dressed.

¶ 9 M.W. testified that although she soon thereafter reported Hildreth on a website, she did not initially go to the police because she "just wanted to let it go." However, after seeing Hildreth on the news and learning of his arrest, she finally contacted the police.

*A.W.'s Testimony (Count VI)*

¶ 10 A.W. testified that in the spring of 2004, she saw Hildreth one time for a chiropractic treatment that her mother had arranged for her. At the time, Hildreth had an

---

**5.** The follow up appointment was also in October 2006.

office set up in the basement of his home. A.W. testified that when she arrived at the home office, Hildreth told her to change in the bathroom and recommended that she remove her bra because it would make the adjustment easier. Hildreth also told her that it was "optional" to leave her underwear on, which she did. After changing, A.W. got on the massage table. Hildreth informed A.W. "that he was going to do some soft tissue work" and told her that he would be working on her arms, neck, shoulders, hips, and legs. A.W. testified that she consented to the treatment.

¶ 11 A.W. testified that during the course of the treatment, Hildreth "lightly brushed over" her crotch area over the top of her underwear. Initially, A.W. thought it was just "inadvertent touching," but then she felt Hildreth's "hands kind of reach a little bit to the edge of where the side of [her] crotch and [her] panties were." After his hand again "brushed" over her crotch area, A.W. testified that Hildreth's "finger slightly slid underneath" her underwear and "advanced further into the crotch of [her] panties touching [her] labia." After the massage, Hildreth then did a more typical chiropractic "adjustment." A.W. testified that at one point, Hildreth lifted the sheet covering her, exposing her bare breasts. A.W. testified that she was "100 percent sure there was nobody else in the room" and that she did not say anything to Hildreth because she was scared.

¶ 12 A.W. testified that after Hildreth was arrested, A.W.'s mother read of his arrest in the newspaper and recommended that A.W. contact the police and report the incident. A.W. acknowledged that at the time she made the police report, she stated that she thought the touching was an accident. At the time of trial, however, she testified that she "kn[ew Hildreth] had done something wrong."

*C.W.'s Testimony (Counts I and II)*

¶ 13 Having heard the testimony of B.B., M.W., and A.W., the jury then heard C.W.'s testimony. C.W. testified that she originally began seeing Hildreth as a patient in 2005. She testified that after she stopped seeing

him as a patient, Hildreth called her and offered her a job as a part-time receptionist and chiropractic assistant. After several calls from Hildreth, C.W. accepted the position in October 2006. C.W. testified that after beginning her employment, she resumed seeing Hildreth as a patient and that Hildreth routinely treated her for problems related to her scapula.[6]

¶ 14 C.W. testified that in early May 2007, she had a bladder infection, which she mentioned at work. Shortly thereafter, during a routine examination of her scapula, Hildreth and C.W. had a conversation about the bladder infection. Specifically, C.W. told Hildreth that the bladder infection had cleared up but that she had now developed a vaginal infection. C.W. testified that Hildreth said, " 'Well, let me take a look at it. You know in California chiropract[ors] are allowed to work in this area as well.' " C.W. agreed to allow him to examine her.

¶ 15 After C.W. pulled her pants down past her knees, Hildreth inspected the area and confirmed that C.W. had an infection. Hildreth then applied colloidal silver gel to C.W.'s vaginal area. C.W. testified that a few days later, Hildreth again examined her and applied colloidal gel to her vaginal area. C.W. testified that although these examinations were "uncomfortable," she did not feel Hildreth had acted inappropriately.

¶ 16 C.W. testified that at the end of the work day on Friday, May 18, 2007, Hildreth again examined her scapula. For the examination, C.W. testified that she removed her clothing from the waist up and put on a hospital gown that tied in the back. At some point, Hildreth and C.W. again discussed C.W.'s vaginal infection. C.W. lowered her pants, and Hildreth examined her vagina. C.W. testified that unlike the previous two examinations, this time when Hildreth applied the colloidal gel, he inserted his hand more fully into her vagina. In fact, C.W. testified that Hildreth's "hand was all the way up in there, and he rubbed for a longer time . . . after he put the gel in there" and that "[i]t felt like his whole hand" was inside her vagina. C.W. also testified, "[Hildreth]

6. The scapula is also known as the shoulder blade.

was rubbing it this way and up and down all around in there. He just rubbed for a long time."

¶ 17 C.W. testified that at some point her hospital gown came unloose, exposing her naked body from her chest to her knees. Hildreth, who was standing next to the examination table with his right hand inside C.W.'s vagina, then began "flicking" her nipple with his left hand. C.W. did not know exactly how long this continued but testified that it was "too long." C.W. also testified that she did not cry out because she was "in shock," and that Hildreth eventually left the examination room and she got dressed. C.W. testified that over the weekend she thought about what had happened and decided to confront Hildreth.

¶ 18 The following Monday, May 21, 2007, C.W. arrived at work for her normal shift. C.W. testified that when Hildreth saw her, he asked, " 'What's the matter? You look upset about something.' " C.W. testified that, at that point, she thought perhaps Hildreth had not meant the examination in "that way" and decided not to confront him. Instead, at the end of the work day, three of C.W.'s children came in for chiropractic treatments. C.W. testified that she got her children settled in different rooms on various machines and then went into the massage room and set herself up on a neck pump.

¶ 19 Hildreth came into the room with a hospital gown and told C.W. that he had time and wanted to work on her scapula. C.W. agreed. After Hildreth left the room, she removed her clothing from the waist up and put on the gown. When Hildreth came back in the room, he closed the door and pushed the massage table against the door, "barricading" the doorway. After working on her scapula, Hildreth asked to examine her vagina. C.W., who admitted she is not "the most assertive person sometimes," then testified that she did not say anything to Hildreth and lowered her pants. Hildreth examined the area and again began rubbing the colloidal gel inside her vagina. This time, he rubbed

her vagina "for a really long time .... to the point where it hurt." C.W. testified that she told him, " 'That's enough. It's starting to hurt,' " but that Hildreth continued "rubbing that whole area, especially where [her] clitoris was," and "did the inside and the outside." C.W. testified that her hospital gown had again somehow slipped off and her bare breasts were exposed. Hildreth began rubbing her breasts, and C.W. testified that she "felt like he was trying to sexually arouse [her] or something." C.W. then tried to reach for the hospital gown, but Hildreth took it away. C.W. testified that Hildreth also turned off the light and then "kept doing what he was doing."

¶ 20 C.W. testified that she did not cry out to her children in the next room and that Hildreth eventually stopped, tried to give her a hug, and left the room. When C.W. exited the room into the main office area, Hildreth asked, " 'That was okay, wasn't it?' " C.W. told him "it was too much rubbing."

¶ 21 C.W. testified that she later confided in her brother, her parents, and her LDS bishop about what had been happening. She also reported Hildreth's conduct to the police and quit her job.[7]

*Hildreth's Testimony*

¶ 22 At trial, Hildreth took the stand during the defense's case-in-chief. He testified that he had a friendly relationship with C.W. and that he had helped her out on numerous occasions—with money, car rides, and car repairs—because "all [his] employees were single mothers and had kids; and it wasn't unusual for [him] to help just one person out." Hildreth also testified that C.W. confided in him about her personal life, including her divorce and her finances, and that at one point, she told him that she could not afford a gynecologist.

¶ 23 Hildreth testified that in early May 2007, C.W. had been complaining in the office about a vaginal infection. Hildreth also testified that during a routine examination involving her scapula, C.W. asked him to inspect

---

7. The examinations on Friday, May 18, 2007, and Monday, May 21, 2007, were the basis of the two counts against Hildreth related to C.W. Hildreth was never charged in connection with the prior two examinations—where C.W. felt uncomfortable but did not feel Hildreth acted inappropriately.

her vaginal area. Although Hildreth admitted that doing such an exam was "not allowed under the Utah chiropractic guidelines" and that it was "stupid of him" to do it, Hildreth agreed to do the exam because he and C.W. "were good friends" and he "knew she couldn't afford it." Hildreth also testified that during the exam, C.W. removed her own clothing and pointed out the infection to him. After he confirmed the presence of an infection, Hildreth testified that he asked C.W. if she would like him to apply colloidal silver gel on it for her or if she would like to do it herself. Hildreth testified that C.W. told him, " 'Go ahead,' " and that after placing a rubber finger cot on his finger, he applied the gel to her vagina. Hildreth testified that he conducted another similar examination a few days later, again at C.W.'s request.

¶ 24 Hildreth testified that on Friday, May 18, 2007, he performed a routine examination of C.W.'s scapula. During the examination, C.W., who had this time removed all of her clothing for the exam, again asked him to look at her vagina to see if the infection had cleared up. Hildreth testified that C.W. also asked him to see if he could "feel anything odd" on her right breast, so he checked both breasts for any lumps, even though he acknowledged that was "not in [a chiropractor's] scope of practice." Hildreth then conducted the vaginal examination and applied the gel "very thoroughly." Hildreth testified that C.W. never indicated that she was unhappy with the exam or asked him to stop.

¶ 25 Hildreth testified that the following Monday, May 21, 2007, C.W. arrived at work for her scheduled shift. At the end of the work day, C.W.'s children came to the office for treatments, and C.W. set them up in rooms on machines. Hildreth testified that he then examined C.W.'s scapula and that during this examination, he asked C.W. about her vaginal infection. Hildreth testified that C.W. again asked him to inspect it. Hildreth testified that he moved the table up against the door of the examination room "to prevent [C.W.'s] children [from] walking in on the procedure." Although the infection was " 'almost gone,' " Hildreth asked her if she wanted him to apply the colloidal gel and C.W.

agreed. Hildreth testified that after the exam, C.W. got up from the examination table "bare butt naked" and "didn't even put the robe up against her." Hildreth also testified that C.W. never cried out during the examination or asked him to stop. Finally, Hildreth testified that he had no intent whatsoever to sexually gratify either himself or C.W. by conducting the vaginal examinations.

¶ 26 Hildreth also testified about his examinations of B.B. Hildreth testified that he palpated B.B.'s ribs "skin-to-skin" during a chest examination because he had been taught to do the examination that way while in chiropractic school. He also testified that he performed a standing chest adjustment skin-to-skin according to his training because it avoided "slippage," which could cause her injury. Hildreth also acknowledged that it was possible that he could unintentionally touch the nipple during the procedure. Hildreth also testified that he lowered B.B.'s pants to her pubic bone because he was examining her Psoas muscle and it was necessary to get all of the clothing out of the way to avoid discomfort to the patient. Hildreth also testified that B.B. consented to the procedures and never objected in any way. Finally, Hildreth testified that he had no intent to sexually gratify himself or B.B. in conducting the examinations.

¶ 27 Hildreth also testified regarding his examinations of M.W. Again, he testified that he had performed the standing chest adjustment skin-to-skin according to his chiropractic training. Hildreth also testified that he had performed a pregnancy massage on M.W. because there are limited procedures available to pregnant women. Hildreth testified that during the massage, M.W. was not exposed from the waist down; rather, Hildreth testified that he "made sure [M.W.] had a double gown on her" but acknowledged it was "very possible" the gown could have slipped off. Finally, Hildreth testified that M.W. consented to the pregnancy massage and "[a]bsolutely" did not complain while he was conducting the examination.

¶ 28 As to A.W., Hildreth testified that he performed a chiropractic massage for her in the spring of 2004. Hildreth testified that during the massage, A.W. was unclothed ex-

cept for her underwear, and that they were not alone but that "[t]here w[ere] many people in and out of the room." Hildreth further testified that it was possible that the "side of [his] hands or something" could have "bumped into" A.W.'s vaginal area during the massage but that he did not intentionally touch her in an inappropriate manner. Hildreth also testified that A.W. consented to the full body massage, that she told him it felt "really good," and that she gave him no indication "whatsoever" that she was uncomfortable with what he was doing. Finally, Hildreth testified that he had no intent to sexually arouse either himself or A.W. during the massage.

¶ 29 At the conclusion of the trial, the jury convicted Hildreth of Counts I and II, for his conduct relating to C.W., but acquitted him of Counts III through VI for his conduct relating to B.B., M.W., and A.W. Hildreth now appeals his convictions relating to C.W., arguing that the trial court erred by denying his motion for severance. We reverse and remand.

## ISSUE AND STANDARD OF REVIEW

¶ 30 Hildreth contends that the trial court erred in denying his motion for severance.

[T]he grant or denial of severance is a matter within the discretion of the trial judge, so we reverse [a denial] only if the trial judge's refusal to sever charges is a clear abuse of discretion in that it sacrifices the defendant's right to a fundamentally fair trial. Under [the abuse of discretion] standard, we will not reverse ... unless the decision exceeds the limits of reasonability.

*State v. Balfour*, 2008 UT App 410, ¶ 10, 198 P.3d 471 (alterations and omission in original) (citation and internal quotation marks omitted).

## ANALYSIS

### I. Severance of Charges

¶ 31 Hildreth argues that the trial court abused its discretion in denying his

motion to sever. Utah Code section 77–8a–1 allows the joinder of offenses and defendants if certain criteria are met. *See* Utah Code Ann. § 77–8a–1 (2008). More specifically, that section provides,

(1) Two or more felonies, misdemeanors, or both, may be charged in the same indictment or information if each offense is a separate count and if the offenses charged are:

(a) based on the same conduct or are otherwise connected together in their commission; or

(b) alleged to have been part of a common scheme or plan.

. . . .

(4)(a) If the court finds a defendant or the prosecution is prejudiced by a joinder of offenses or defendants in an indictment or information or by a joinder for trial together, the court shall order an election of separate trials of separate counts, grant a severance of defendants, or provide other relief as justice requires.

*Id.* § 77–8a–1(1), (4)(a). "Thus, joinder of multiple offenses is appropriate if the requirements of Utah Code section 77–8a–1(1) are met and neither the defendant nor the prosecution is prejudiced as a result of the joinder." *Balfour*, 2008 UT App 410, ¶ 18, 198 P.3d 471. As discussed in more detail below, we conclude that the trial court erred in denying Hildreth's motion to sever because the charges were neither connected in their commission nor part of a common scheme or plan.

### A. The Alleged Crimes Were Unconnected in Their Commission.

¶ 32 Hildreth argues that the charges do not satisfy section 77–8a–1(1)(a) because they were not connected in their commission.[8] While the case law in Utah construing this language is limited, as a general rule, charges are connected in their commission when there is a "direct relationship" between them, often because the conduct resulting in one charge was "precipitated" by conduct resulting in another charge. *See*

---

8. Hildreth limits his argument to the "otherwise connected in their commission" language of sec-

tion 77–8a–1(a), and we limit our analysis accordingly.

*State v. Scales*, 946 P.2d 377, 385 (Utah Ct.App.1997) (holding that the theft and murder charges were connected in their commission where defendant's purpose in stealing the car and firearms was to facilitate his flight from the scene of the murder). Charges are also connected where one crime is committed in an effort to conceal another or previous crime. *See State v. Smith*, 927 P.2d 649, 653 (Utah Ct.App.1996) (concluding that the evidence tampering and manslaughter charges were sufficiently connected for purposes of section 77–8a–1(1)(a) where the defendant threw the drug paraphernalia in the trash can to conceal the illegal drug activities that caused him to be charged with manslaughter). But such is not the case here. Other than the fact that all of the conduct was committed by Hildreth, the charges were not directly related to one another. Moreover, none of the charges was precipitated by the commission of the others, nor were any of the charges committed in an attempt to conceal the others. Accordingly, we conclude that the charges were not connected in their commission as contemplated by section 77–8a–1(1)(a), *see* Utah Code Ann. § 77–8a–1(1)(a).

### B. The Crimes Were Not Part of a Common Scheme or Plan.

¶ 33 Hildreth also argues that the trial court erred in denying his motion to sever because the charges were not part of a common scheme or plan. " '[T]o be classified as a common plan or scheme it is not necessary for the crimes to have been perpetrated in an absolutely identical manner, so long as the court perceives a visual connection between the . . . crimes.' " *Balfour*, 2008 UT App 410, ¶ 20, 198 P.3d 471 (alteration in original) (additional internal quotation marks omitted) (quoting *State v. Lee*, 831 P.2d 114, 117 (Utah Ct.App.1992)). Thus, while absolutely identical conduct is not required, "striking similarities" in the conduct more readily supports a determination that the conduct occurred as part of a common scheme or plan. *See Lee*, 831 P.2d at 118; *cf. State v. Nelson–Waggoner*, 2000 UT 59, ¶¶ 3, 29, 6 P.3d 1120 (concluding, in the context of rule 404(b) analysis, that "there were significant and *striking* similarities in the manner

in which [the] defendant carried out [several rapes]" where defendant had invited each victim to his room on a pretense; worn clothing that could be easily removed; locked the door before each rape; requested that each victim kiss his body before he raped her; used the same highly unusual and confining sexual position during the commission of the rapes; and told each victim to "enjoy the moment" or to stop "ruining a beautiful thing" (emphasis added)).

¶ 34 Furthermore, "[t]his court has interpreted the phrase 'common scheme or plan' to apply when the crimes involve a similar fact pattern *and proximity in time.*" *Balfour*, 2008 UT App 410, ¶ 20, 198 P.3d 471 (emphasis added). Accordingly, the facts and the timing of the incidents should be considered in their totality, that is, factual similarities should be viewed in light of their temporal proximity to one another. *See id.; see also Lee*, 831 P.2d at 118 (holding that "the striking similarities . . . in each incident, *coupled with* the proximity in time of the offenses, supplied a sufficient basis for the trial court to conclude that the crimes were alleged to have been part of a common scheme or plan" (emphasis added) (internal quotation marks omitted)); *cf. United States v. Drew*, 894 F.2d 965, 970 (8th Cir. 1990) ("[P]roximity in time *combined with* similarity in type of crime virtually guarantees admittance of prior bad acts evidence . . . ." (emphasis added)); *Nelson–Waggoner*, 2000 UT 59, ¶ 29, 6 P.3d 1120 (considering the combination of the "significant and striking similarities" as well as the "brief ten week[ ]" period between the crimes in conducting 404(b) analysis).

¶ 35 We conclude that under these rules, the facts of this case do not demonstrate the existence of a common scheme or plan. C.W. testified that in May 2007, Hildreth penetrated her vagina with his "whole hand" on two separate occasions; that he rubbed her vaginal area, including her clitoris, for "too long," until it began to hurt; that he simultaneously touched her bare breasts and "flicked" her nipple; that she told him to stop but he continued anyway; that he barricaded the door to the examination room on one occasion; and that she felt Hildreth was trying to

sexually arouse her. In contrast, B.B. testified that in June or July 2006, Hildreth exposed her naked body from the waist up and that as he was palpating her rib cage, his fingers "went over [her] nipple"; that he pulled her pants down "enough to where her pubic bone or hair was showing" and felt around her pubic bone; and that in a subsequent examination, some seven to nine months later, Hildreth put his hand underneath her gown and touched her breast skin-to-skin. M.W. testified that during an examination in October 2006, she remained fully clothed but that Hildreth had put his hand under her shirt and bra and had touched the side of her breast skin-to-skin, not quite to her nipple area; that the following week, Hildreth exposed her from the waist down, massaging her stomach and buttocks; and that during the massage, she "could feel [him] lifting up [her] back side" and "could feel [her] cheeks separating." Finally, A.W. testified that during a chiropractic massage in spring 2004, Hildreth had "lightly brushed" her crotch area and also touched her labia under her underwear.

¶ 36 Aside from the fact that Hildreth was all of the women's chiropractor and that all of the conduct occurred during the course of treatment while the women were alone with him, there are too many variations in the circumstances and conduct to conclude that there is a "parallel fact pattern ... [that] plainly demonstrates the existence of a calculated plan," *see Lee*, 831 P.2d at 118.[9] Given that the incidents involved different body parts, different levels of undress and possibly unnecessary exposure, and different types of touching—from light brushing and massage to vigorous rubbing and actual penetration—we cannot say that there are striking similarities in Hildreth's conduct with each woman.

*See State v. Balfour*, 2008 UT App 410, ¶ 30, 198 P.3d 471 (concluding that no common scheme or plan existed as to one of the complainants because, among other factors, she alleged that the defendant had rubbed his naked penis against her covered vagina, while the other women alleged only that defendant had touched their breasts).

¶ 37 Our conclusion is underscored when Hildreth's conduct is viewed in light of the lack of temporal proximity of the events. *See id.* ¶¶ 28–30 (refusing to "interpret ... temporal proximity so broadly" as to include an incident involving one woman that took place sixteen months before the incidents involving the other women); *Lee*, 831 P.2d at 118 (concluding that, where the two criminal offenses occurred only five days apart, "[t]he striking similarities, *coupled with* the proximity in time of the offenses," justified the trial court's determination that the crimes were part of a common scheme or plan (emphasis added)). Here, the incidents occurred in May 2007 (C.W.), October 2006 (M.W.), June or July 2006 and February or March 2007 (B.B.), and 2004 (A.W.). While the relatively short time differences between the incident involving C.W. and the incidents involving M.W. and B.B. present a closer call,[10] we are obliged to "resolve the issue in favor of assuring the defendant a fair trial." *Balfour*, 2008 UT App 410, ¶ 31, 198 P.3d 471.

"[C]are must be taken that [Utah Code section 77–8a–1] is not misused to deprive an accused of a fair trial upon an offense by joining different offenses so that evidence concerning charges unrelated in time and nature ... could be admitted as to the multiple offenses in an effort to stigmatize the defendant and thus make it questionable that the jury would give a fair

---

9. And we cannot say that using a position of trust to gain access to a victim or physically isolating an individual in order to commit an assault are facts that are particularly unusual in the context of sexual assault cases generally. *See State v. Cox*, 787 P.2d 4, 6 (Utah Ct.App.1990) (noting that the similarities in the case "are common to many assault or rape cases and are not peculiarly distinctive of [the] defendant's conduct" where the defendant knew each victim, committed the assaults when the victims were isolated, laid on top of the victims, and left the premises after the assaults were over).

10. Where the conduct involving A.W. occurred a full three years before the conduct relating to C.W., and over two years prior to the conduct involving B.B. and M.W., it was clearly not a part of a common scheme or plan. *See State v. Balfour*, 2008 UT App 410, ¶ 30, 198 P.3d 471 (concluding that no common scheme or plan existed as to one count where, inter alia, the underlying conduct occurred sixteen months before the conduct underlying the other counts).

and dispassionate consideration to the evidence on the first charge."

*Id.* (second alteration and omission in original) (quoting *State v. Gotfrey,* 598 P.2d 1325, 1328 (Utah 1979)). Accordingly, we conclude that Hildreth's conduct did not constitute a common scheme or plan under Utah Code section 77–8a–1(1)(b). Because we have determined that the charges in this case were unconnected in their commission, *see* Utah Code Ann. § 77–8a–1(1)(a) (2008), and not part of a common scheme or plan, *see id.* § 77–8a–1(1)(b), we conclude that the trial court exceeded its permissible range of discretion in denying Hildreth's motion for severance.

¶ 38 The severance statute further provides,

> If the court finds a defendant or the prosecution is prejudiced by a joinder of offenses or defendants in an indictment or information or by a joinder for trial together, the court shall order an election of separate trials of separate counts, grant a severance of defendants, or provide other relief as justice requires.

*Id.* § 77–8a–1(4)(a). *See generally State v. Scales,* 946 P.2d 377, 385 (Utah Ct.App.1997) ("If we determine that the offenses either were connected together in their commission or were alleged to be part of a common scheme or plan, we must then examine whether the trial court complied with subsection (4)(a)."). Although we have determined that joinder was improper here, in cases where it has been determined joinder was proper and the defendant claimed prejudice under subsection (4)(a) of the severance statute, we have equated prejudice with whether the evidence would have properly come in anyway under rule 404(b) of the Utah Rules of Evidence, *see* Utah R. Evid. 404(b). Stated another way, an otherwise proper joinder of multiple charges is prejudicial if evidence of the other bad acts would not have been admissible in a separate trial. *See, e.g., State v. Mead,* 2001 UT 58, ¶¶ 58–59, 27 P.3d 1115. Here, the State argues that such analysis is equally appropriate.

## II.  Rule 404(b) Analysis

¶ 39 Under rule 404(b) of the Utah Rules of Evidence, evidence of a defendant's prior bad acts is not admissible to show that he or she acted in conformity with the bad behavior. *See* Utah R. Evid. 404(b). Rule 404(b) does, however, allow for admission of prior bad acts evidence "for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *Id.* "Thus, 'evidence . . . offered under [rule] 404(b)[ ] is admissible if it is relevant for a non-character purpose and meets the requirement of Rules 402 and 403 [of the Utah Rules of Evidence].' " *State v. Marchet,* 2009 UT App 262, ¶ 28, 219 P.3d 75 (alterations and omission in original) (quoting Utah R. Evid. 404(b) advisory comm. note), *cert. denied,* 221 P.3d 837 (Utah 2009).

¶ 40 Whether testimony regarding prior bad acts is admissible requires a three-part analysis. The first inquiry is "whether the bad acts evidence is being offered for a proper, noncharacter purpose, such as one of those specifically listed in rule 404(b)." *State v. Nelson–Waggoner,* 2000 UT 59, ¶ 18, 6 P.3d 1120; *see also Marchet,* 2009 UT App 262, ¶ 29, 219 P.3d 75. "If the purpose is deemed proper, 'the court must [next] determine whether the bad acts evidence meets the requirements of rule 402, which permits admission of only relevant evidence.' " *Marchet,* 2009 UT App 262, ¶ 29, 219 P.3d 75 (alteration in original) (quoting *Nelson–Waggoner,* 2000 UT 59, ¶ 19, 6 P.3d 1120). Finally, "the court must analyze the evidence in light of rule 403 to assess whether its probative value is substantially outweighed by the risk of unfair prejudice to the defendant." *Id.*

### A.  Proper Noncharacter Purpose

¶ 41 The rebuttal testimony of B.B., M.W., and A.W. would be admissible in a separate trial for a proper, noncharacter purpose under rule 404(b), namely, to show Hildreth's intent and absence of accident. At trial, Hildreth specifically testified that he did not intend to arouse or sexually gratify himself

or the women during the examinations.[11] Thus, the evidence from all three women would be admissible to respond to or rebut that testimony for the noncharacter purposes of showing Hildreth's intent. Moreover, while Hildreth's defense during his case-in-chief was that the women consented to his conduct, Hildreth also claimed that at least as to B.B. and A.W., any improper touching could have been inadvertent. Thus, the evidence from B.B. and A.W. would also be admissible to rebut that testimony for the noncharacter purposes of showing absence of an accident. *Cf. State v. Fedorowicz*, 2002 UT 67, ¶ 30, 52 P.3d 1194 (concluding that the defendant had raised the defense of accident "despite not affirmatively presenting that defense in his case-in-chief" where he had told investigators that the child was injured accidentally and also questioned the State's witnesses about the possibility of accidental injury). The evidence would therefore be admissible for a proper noncharacter purpose.

B. Relevance Under Rules 401 and 402

¶ 42 Like all evidence, prior bad acts evidence must be relevant or it is inadmissible. *See* Utah R. Evid. 402. Relevant evidence is broadly defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Id.* R. 401. In this case, the rebuttal evidence regarding B.B., M.W., and A.W. is relevant because it tended to show Hildreth's intent. It is therefore relevant and admissible under rules 401 and 402.

C. Prejudicial Versus Probative Value Under Rule 403

■ ¶ 43 Rule 403 of the Utah Rules of Evidence provides, "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." *Id.* R. 403. In *State v. Shickles*, 760 P.2d 291 (Utah 1988), the Utah Supreme Court outlined several guiding factors to be considered in balancing the probative value of bad acts evidence against its prejudicial effect. *See id.* at 295–96. These *Shickles* factors include the following:

> [(1)] the strength of the evidence as to the commission of the other crime, [(2)] the similarities between the crimes, [(3)] the interval of time that has elapsed between the crimes, [(4)] the need for the evidence, [(5)] the efficacy of alternative proof, and [(6)] the degree to which the evidence probably will rouse the jury to overmastering hostility.

*Id.*

¶ 44 We conclude that, on balance, the *Shickles* factors weigh in favor of exclusion of the prior bad acts evidence. First, the strength of the evidence involving B.B., M.W., and A.W. is relatively weak, particularly given that Hildreth was acquitted of those charges, thus undercutting the credibility of the women's testimony. *Cf. Nelson–Waggoner*, 2000 UT 59, ¶ 31, 6 P.3d 1120 (acknowledging that while the victim's prior bad acts testimony was not necessarily inadmissible, it "was *suspect* because defendant had already been acquitted of the alleged rape to which she testified" (emphasis added)). Second, as discussed in Part I, the prior bad acts are not sufficiently similar to the conduct involving C.W. Third, the interval of time that had elapsed between the prior bad acts and the incident involving C.W. is fairly lengthy.[12] *But see State v. Marchet*, 2009 UT App 262, ¶ 45, 219 P.3d 75 (upholding the trial court's decision that two-year time difference between another bad act and alleged crime was sufficiently proximate to warrant admission). With respect to the final factor, the cumulative prior bad acts evidence may have the tendency to suggest a verdict on an improper, emotional basis.

---

11. The forcible sexual abuse statute under which Hildreth was charged requires that he acted "with the intent ... to arouse or gratify the sexual desire of any person." Utah Code Ann. § 76-5-404 (2008).

12. This is undoubtedly true as to A.W. because the incident involving her occurred a full three years prior to the C.W. incident.

¶ 45 The other two *Shickles* factors—factors four and five—tend to weigh in favor of admission of the prior bad acts evidence. Particularly, given that the incident involving C.W. is a "he said/she said" situation, there would be a need for the prior bad acts evidence. *See Nelson–Waggoner*, 2000 UT 59, ¶ 30, 6 P.3d 1120 (stating that "the need for the bad acts evidence was great" where the defense was consent and the trial involved a "contest of credibility" between the accuser and the accused). Moreover, "no alternative evidence regarding consent exist[s] other than [C.W.]'s and [Hildreth]'s directly conflicting testimonies." *See id.*[13]

¶ 46 On balance, however, the majority of the *Shickles* factors weigh in favor of exclusion of the prior bad acts evidence. Moreover, given the nature of the State's case vis-a-vis C.W., we conclude that any possible probative value of the evidence would be substantially outweighed by the danger of unfair prejudice to Hildreth. Because we conclude that all of the prior bad acts evidence would not properly come in at a trial on the charges concerning only C.W., we readily conclude there was prejudice, as defined in the severance statute. On that basis, we reverse and remand for a new trial on the charges relating to C.W.

## CONCLUSION

¶ 47 We conclude that the trial court exceeded its permissible range of discretion in denying Hildreth's motion for severance and that Defendant was prejudiced thereby. Accordingly, we reverse Hildreth's convictions and remand for a new trial. On remand, the prior bad acts evidence relating to B.B., M.W., and A.W. should be excluded.

¶ 48 I CONCUR: GREGORY K. ORME, Judge.

McHUGH, Associate Presiding Judge (concurring in the result):

¶ 49 I agree that the pretrial severance motion should have been granted and that Hildreth is entitled to a new trial. Because

---

13. We note, however, that in sexual assault cases where the defense is that the victim "consented,"

my analysis with respect to the new trial issue is different than that of the lead opinion, I write separately.

¶ 50 I agree with the lead opinion that the offenses related to C.W. were not connected to or part of a common scheme or plan with the charges related to the other women. Thus, I also agree that because the charges are not connected or part of a common scheme, our error analysis is complete and we need not consider prejudice in connection with that question, *see generally* Utah Code Ann. § 77–8a–1(4)(a) (2008) (requiring the court to hold separate trials if joinder will prejudice the prosecution or the defense will be prejudiced, even if joinder would otherwise be permissible under the statute); *State v. Balfour*, 2008 UT App 410, ¶¶ 30–31 & n. 11, 198 P.3d 471 (holding, without considering prejudice, that the trial court erred in denying the defendant's motion to sever where there was no connection between or common scheme or plan involving the charges); *State v. Scales*, 946 P.2d 377, 385 (Utah Ct.App.1997) ("If we determine that the offenses either were connected together in their commission or were alleged to be part of a common scheme or plan, we must then examine whether the trial court complied with subsection [77–8a–1](4)(a).").

¶ 51 However, this case comes to us after the charges were improperly joined at trial and Hildreth was convicted only on those charges arising out of the allegations of C.W. Thus, in determining whether a new trial is warranted, we must decide whether the trial court's erroneous decision to try the charges together was harmless or prejudicial. *See State v. Calliham*, 2002 UT 86, ¶ 34, 55 P.3d 573 ("Any error in denying severance will be deemed harmless unless [the] defendant can 'establish a reasonable likelihood of a more favorable outcome if the court had granted a severance.'" (quoting *State v. Ellis*, 748 P.2d 188, 190 (Utah 1987))). Hildreth argues that he was prejudiced because the testimony of B.B., M.W., and A.W. negatively impacted the jury's view of the evidence relating to C.W.'s allegations. However, if the testimo-

---

this will almost always be the case.

ny of the other women would have been admitted anyway, even if the charges related to C.W. had been severed from the others, Hildreth's argument fails. Thus, to assess Hildreth's claim of prejudice, I engage in virtually the same analysis as required under subsection 77–8a–1(4)(a) of the severance statute, *see* Utah Code Ann. § 77–8a–1(4)(a). This analysis focuses on whether the testimony related to the other charges would have been admissible as other bad acts under rule 404(b) of the Utah Rule of Evidence in a trial limited to the offenses related to C.W.

¶ 52 In implementing that three-part analysis, *see supra* ¶ 40, I agree with the majority that the evidence was offered for proper purposes and was relevant. With respect to the third part of the 404(b) analysis, whether the probative value of the evidence was outweighed by unfair prejudice under rule 403, I first note that there is little indication in the record that the trial court considered the applicable factors identified in *State v. Shickles*, 760 P.2d 291, 295–96 (Utah 1988), *see supra* ¶ 43, let alone that it "scrupulously examined" them, *see State v. Nelson–Waggoner*, 2000 UT 59, ¶ 16, 6 P.3d 1120 (internal quotation marks omitted). Thus, I undertake that analysis in the first instance on appeal to evaluate whether the error here was prejudicial. In weighing those factors, I agree that B.B. and A.W.'s testimony would have been excluded but conclude that M.W.'s testimony would have been admitted under rule 404(b).

¶ 53 Starting with the application of the *Shickles* factors to the testimony of M.W., the fact that she reported her concerns about Hildreth on a website immediately after her second visit bolsters the strength of her allegations, although apparently not enough to convince the jury. I would resolve this *Shickles* factor as weighing slightly in favor of the State. Hildreth's touching of C.W.'s vaginal area is more disturbing than M.W.'s report that Hildreth touched her breast during the first visit and that he touched her buttocks during the second visit. However, both with C.W. and with M.W., Hildreth used the chiropractic setting to touch body parts traditionally considered relevant to sexual gratification, *see* Utah Code Ann. § 76–5–404

(2008) (providing that a person is guilty of forcible sexual abuse if the victim is fourteen or older and "the actor touches the anus, buttocks, or any part of the genitals of another, or touches the breast of a female," under certain defined circumstances). Therefore, I would weigh the similarity factor as balancing somewhat in favor of the State on this issue. Because M.W. saw Hildreth in October of 2006, seven months prior to his first touching of C.W.'s vagina, I would evaluate the temporal proximity as neutral. As to the fourth and fifth factors, I agree with the lead opinion that there was a need for the evidence and that alternative evidence was not available. Last, because C.W.'s allegations are more shocking than M.W.'s, I conclude that M.W.'s testimony would not arouse the jury to overmastering hostility. On balance, I conclude that M.W. would have been permitted to testify under rule 404(b) in a trial limited to the charges related to C.W.'s allegations.

¶ 54 With respect to B.B., I agree with the majority that her allegations were not strong. B.B. visited Hildreth thirty to forty times after the alleged first incident and four or five times after the second, and did not make a complaint about his conduct until she heard that he had been arrested. Indeed, these facts may have affected the jury's decision to acquit Hildreth on these charges. I also agree that the behavior described by C.W. was much more intrusive than that described by B.B. This is particularly evident with respect to the first incident, where although Hildreth pushed B.B.'s pants down to where her pubic hair was barely showing, he touched her only above her panties in the pubic bone area. The second incident, where Hildreth allegedly touched B.B.'s breast during a rib cage adjustment, is also not as disturbing as Hildreth's admitted examination and touching of C.W.'s vagina. Although, like the testimony of M.W., it describes the use of a medical setting to obtain access to a part of the body traditionally associated with sexual gratification, *see* Utah Code Ann. § 76–5–404, the alleged touching was fleeting. Therefore, I would weigh the *Shickles* similarity factor as neutral with respect to the second incident but against the State as to the first. Further, although the

first incident allegedly happened in the summer of 2006, M.W. claimed that the second incident occurred in March 2007, only two months before Hildreth's first examination of C.W.'s vagina in May 2007. Consequently, I would resolve the temporal proximity issue in favor of the State on the second incident, but against the State on the first. Because I conclude that M.W.'s testimony should have been admitted, I would resolve the *Shickles* factors concerning the need for the evidence and the availability of alternative evidence against the State. Finally, where the allegations of C.W. were much more shocking, I conclude that B.B.'s allegation that Hildreth touched her breast under her gown during the second incident would not rouse the jury to overmastering hostility. Based on my analysis of the proper balance of the *Shickles* factors under the circumstances, I conclude that B.B.'s testimony would not have been admissible under rule 404(b).

¶ 55 A.W. reported her concerns to her mother immediately after her only appointment with Hildreth, but she did not contact the authorities because Hildreth was a family friend and A.W.'s conversation with her mother convinced A.W. that she must have been mistaken about Hildreth's intentions. However, this evidence was not strong enough to convince the jury to convict Hildreth on this charge. On balance, I would resolve this *Shickles* factor as not weighing in favor of either party. A.W.'s allegation that Hildreth used his position as her chiropractor to touch her labia is similar to, although not as intrusive as, C.W.'s allegation that Hildreth used his medical status to insert his finger into her vagina and, therefore, weighs in favor of the State. Because A.W. saw Hildreth in the spring of 2004, three years before the first incident involving C.W., the interval of time between the two incidents weighs against the State. Likewise, M.W.'s testimony, which I conclude would be admitted, could be used for the same proper purposes as the testimony of the other accusers, thereby reducing the need to also introduce A.W.'s testimony. Moreover, there is danger that A.W.'s testimony might create

hostility with the jury, even though her allegations do not actually involve digital penetration. C.W. was an adult woman who allowed her own children to see Hildreth professionally after the acts of which she complains. Although Hildreth was C.W.'s employer, their relationship had some unusual components, which included visits by Hildreth to C.W.'s home, as well as his provision of car maintenance and other support. In contrast, A.W. was a young woman whose mother made her appointment with Hildreth and who knew him as a trusted family friend. Considering all of the *Shickles* factors in the context of this case, I would conclude that A.W.'s testimony would not have been admitted under rule 404(b).

¶ 56 Although my application of the rule 403 analysis convinces me that M.W. would have been permitted to testify in a separate trial on the charges related to C.W., I agree with the lead opinion that Hildreth has established a " 'reasonable likelihood of a more favorable outcome if the court had granted a severance.' " *See State v. Calliham,* 2002 UT 86, ¶ 34, 55 P.3d 573 (quoting *State v. Ellis,* 748 P.2d 188, 190 (Utah 1987)). This case presented a contest of credibility between Hildreth and C.W. In addition, C.W.'s conduct in allowing her chiropractor to apply vaginal gel is highly unusual; the nature of the relationship between C.W. and Hildreth was uncertain; and C.W. continued to see Hildreth as a patient after the first incident, allowing him to apply gel to her vagina again. These and other circumstances of this case convince me that there is a reasonable likelihood that the result might have been different absent the testimony from B.B. and A.W., even assuming M.W. was permitted to testify. Consequently, I concur that Hildreth is entitled to a new trial.