**2022 UT App 69**

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
ADAM TAE KYUN LIM,
Appellant.

Opinion
No. 20190027-CA
Filed June 3, 2022

Third District Court, Salt Lake Department
The Honorable Vernice S. Trease
The Honorable Ann Boyden
No. 161909129

Andrea J. Garland, Attorney for Appellant

Sean D. Reyes and Jeffrey D. Mann,
Attorneys for Appellee

JUDGE DAVID N. MORTENSEN authored this Opinion, in which
JUDGE RYAN M. HARRIS concurred. JUSTICE DIANA HAGEN
concurred in the result.[1]

MORTENSEN, Judge:

¶1     Adam Tae Kyun Lim, a hospital nurse, was charged with
three counts of sexual abuse involving three different female
patients. The incidents took place over nearly seven years, with
over five years separating the first two incidents and almost two
years separating the second and third incidents. Despite the long

---

1. Justice Diana Hagen began her work on this case as a judge of
the Utah Court of Appeals. She became a member of the Utah
Supreme Court thereafter and completed her work on the case
sitting by special assignment as authorized by law. *See generally*
Utah R. Jud. Admin. 3-108(3).

period of time between the instances of alleged abuse and some dissimilarities among the incidents, the State charged Lim in a single information. When Lim moved to sever the counts for separate trials, the district court denied the motion, and Lim was tried and found guilty on the three counts in a single trial. Lim appeals, alleging the court exceeded its discretion in failing to grant his motion to sever. We agree with Lim. We reverse and remand for new trials in which the counts are severed.

BACKGROUND[2]

*First Incident*

¶2　In January 2009, Allie[3] was recovering at St. Mark's Hospital after undergoing surgery for complications related to Crohn's disease. Lim, who had been assigned as Allie's nurse, came into her room during the night while she was resting. He left the lights off, "didn't say anything," and—while acting "like he was checking things"—"inserted his fingers into [her] vagina" and then "just left the room."

¶3　Allie "was in shock initially," but after Lim left, she woke her mother, who was staying in the room with her, and told her what happened. Her mother recalled that Allie "was distraught and crying and very upset" as she told her "what was going on with her." Although Allie had been taking pain medications that made her "tired" and "groggy," she "definitely" knew "that [Lim's] hands went where they were not supposed to be."

¶4　Allie filed a complaint with the hospital a few weeks later "so that if it happened again," the hospital "would know that this

---

2. "On appeal, we review the record facts in a light most favorable to the jury's verdict and recite the facts accordingly." *State v. Holgate*, 2000 UT 74, ¶ 2, 10 P.3d 346 (cleaned up).

3. We employ pseudonyms in this opinion.

person did this and this was happening." During the ensuing investigation—which took place several years later after a third incident that will be discussed below—an investigator with the Utah Division of Occupational and Professional Licensing (DOPL) interviewed Lim about the incident.[4] Lim confirmed that he had been in Allie's room to evaluate her and give her medications, that her mother had been in the room, and that the overhead lights were off when he had evaluated Allie. He was also aware that there had been a complaint that he had inserted his fingers into her vagina, which he denied having done.

*Second Incident*

¶5      In February 2014, Bella was admitted to Intermountain Medical Center (IMC) for an infection in her leg, which ultimately required amputation above her knee. She testified that Lim had been her nurse and that he was "very flirtatious" and told her that she was "cute," which made her "feel really uncomfortable."

¶6      During the evening that she was recovering from her surgery, Lim said he needed to check her catheter. Bella told him that she did not "think it [needed] to be checked." But Lim insisted and proceeded to insert "his fingers inside of [Bella's] vagina and just started . . . moving all around, . . . jerking all around." Bella, who had been catheterized during prior hospitalizations, testified that she had never had a caregiver touch her vagina or put a finger in her vagina when checking a catheter. And although Bella was on pain medication at the time of the incident, she stated that she

---

4. The DOPL investigation was triggered by a February 2016 complaint involving the abuse against another patient, Cora. Lim was then connected to an earlier complaint DOPL had received in May 2014 involving the abuse against yet another patient—Bella. Lim's employment records from St. Mark's were then subpoenaed, and the DOPL investigator discovered the complaint Allie had made against Lim.

did not have "any doubt . . . at all" that Lim had inserted his fingers into her vagina.

¶7     The following morning, Bella complained about the touching, and the police came to her room to investigate. Lim explained to the police officer that the "patient care tech" had told him Bella's "catheter was not working and that he had to pull on the catheter to see if he could make it work." Lim suggested that "when he pulled on the rubber housing that it could have given [Bella] the sensation that somebody was touching her vagina." Lim also explained to the DOPL investigator that because Bella was having trouble breathing, she was sitting up at a ninety-degree angle to make it easier for her to breathe, which would have made it difficult for him to touch her groin area. He also suggested that Bella was "disoriented" due to the combination of surgery, pain medication, and low oxygen. But the DOPL investigator testified that there was nothing in Bella's chart notes to indicate a problem with the catheter, breathing, or Bella being disoriented. Indeed, Lim eventually admitted to the investigator that Bella was sitting at a forty-five-degree angle and that "[t]here was no way that the leg could be elevated," as expected after surgery, had she been sitting straight up.

*Third Incident*

¶8     In December 2015, Cora was hospitalized at IMC for issues related to colitis and Crohn's disease. During New Year's Eve night, Lim, who was assigned as Cora's nurse, entered her room, shut the door, pulled the curtains, and "insisted" that "he had to check" her EKG leads because one was "loose." Cora, who said she had "many EKGs" in the past and knew that "if something's wrong, then the alarm will go off," described Lim's behavior as "not professional at all." While putatively checking the EKG lead, Cora said Lim began "fondling" her breast "back and forth . . . [j]ust across the nipple." Lim then immediately left the room.

¶9     Shortly after midnight, Lim entered Cora's room again, shut the door and curtain, and pulled two drinks from behind his

back to "have a toast." Initially, Cora thought it was sparkling grape cider but then suspected it was champagne. After Lim left, she poured the remainder down the drain. Later, Lim returned to Cora's room to administer pain medication, after which he got down to the level of the bed railing and "just stared" at Cora for a "minute-and-a-half to two minutes . . . not saying anything, just staring," making Cora "very uncomfortable."

¶10    Later, when staff from IMC called to see how her stay was, Cora reported Lim's behavior. In the ensuing investigation, Lim admitted that he went to Cora's room to fix the EKG lead. He first denied touching Cora's breast, but he later acknowledged that he "may have done that by mistake." Lim confirmed that he got down on his knees to watch her because he needed to get eye level with her. He also admitted to giving her a drink of sparkling apple cider that was available at the nurse's station. Lim opined that Cora's pain medications might have "alter[ed] her perception," leading her to lodge a complaint, but he admitted that she did not appear to have "an altered perception" or to be "disoriented."

*Charges and Proceedings*

¶11    Lim was charged in a single information with two counts of object rape and one count of forcible sexual abuse. Before trial, Lim moved the district court to sever the charges and grant separate trials on each count, arguing that there was no common scheme or plan to support joinder and that joinder would prejudice him.[5]

¶12    The State opposed the motion, asserting that Lim was a "registered nurse, who repeatedly had access to vulnerable female patients" and "took advantage of them sexually using similar methods and then repeatedly refuted the complaints filed

---

5. Lim's motion to sever addressed four counts because the State had filed an amended information containing four counts. The fourth count was dropped in a second amended information before trial.

by the women, claiming that the women were confused or mistaken." "[T]he similarity of alleged victims and the commonalities in [Lim's] actions," the State argued, made joinder proper. Specifically, the State said there was "a strong visual connection" among the victims because (1) they were hospitalized in Salt Lake County, Utah; (2) they were treated by Lim in his capacity as a registered nurse; (3) they complained that Lim "committed inappropriate sexual acts after befriending them in a manner unlike other healthcare professionals"; (4) they were abused late in the evening; and (5) they had been given narcotic pain medications.

¶13 The State argued that the joinder would not prejudice Lim because evidence involving all the counts would "likely be admissible whether there was one or multiple trials." The State did not argue that there would be "no prejudice" to Lim in trying all the "counts in a single trial," conceding that "it would be difficult to imagine a scenario in which any defendant might not be prejudiced to at least some degree when a jury is allowed to hear evidence from multiple counts or from prior, uncharged acts." But the State asserted that joinder was not unfairly prejudicial here because even if the charges were severed, "the jury would likely hear a portion, if not all, of the evidence regarding the other charged counts, [since] the evidence would be admissible as 404(b) evidence in each of the separate trials," presumably to counter Lim's assertion that he was "performing appropriate nursing care, which necessarily involves touching the body," and that "these female patients were confused or mistaken regarding their complaints."

¶14 The district court denied Lim's motion to sever. Even though the charges were by nature prejudicial when tried together, the court determined that there was "no prejudice that results by joining them together." "[J]oinder would not result in prejudice to [Lim] because evidence for all [the] counts would be allowed whether there were separate trials (where the evidence would be repeated in each trial) or one trial (where the evidence would be presented only once)." The court elaborated that

"joinder was proper in this case given that evidence in each of the
. . . counts was strikingly similar" and that "evidence from all [the]
counts was necessary to avoid jury confusion and for the jury to
accurately assess any claims made by [Lim] regarding accidental
touching or victim mistake." Lastly, the court determined that,
"based on a careful weighing of the evidence, joinder of the . . .
counts was proper under a 404(b) analysis and would lead to a
fair trial for both parties."

¶15    After a three-day trial, a jury convicted Lim on two counts
of object rape and one count of forcible sexual abuse. Lim appeals.

## ISSUE AND STANDARD OF REVIEW

¶16    Lim contends that the district court exceeded its discretion
when it denied his motion to sever the three counts. "The grant or
denial of severance is a matter within the discretion of the trial
judge, so we reverse a denial only if the trial judge's refusal to
sever charges is a clear abuse of discretion in that it sacrifices the
defendant's right to a fundamentally fair trial." *State v. Balfour*,
2008 UT App 410, ¶ 10, 198 P.3d 471 (cleaned up). "Under the
abuse of discretion standard, we will not reverse unless the
decision exceeds the limits of reasonability." *State v. Hildreth*, 2010
UT App 209, ¶ 30, 238 P.3d 444 (cleaned up).[6]

## ANALYSIS

¶17    "Two or more felonies . . . may be charged in the same
indictment or information if each offense is a separate count and
if the offenses charged are . . . alleged to have been part of a

---

6. Lim has also raised issues of ineffective assistance of counsel
and cumulative error, in addition to seeking remand pursuant to
rule 23B of the Utah Rules of Appellate Procedure. Because we
reverse on the severance issue, it is unnecessary to address these
remaining issues.

common scheme or plan." Utah Code Ann. § 77-8a-1(1)(b) (LexisNexis 2017). But even where joinder is proper under the common scheme or plan rubric, "[i]f the court finds a defendant . . . is prejudiced by a joinder of offenses . . . , the court shall order an election of separate trials of separate counts." *See id.* § 77-8a-1(4)(a).

¶18　The joinder of the three counts against Lim fails on both prongs (i.e., common scheme or plan and prejudice). We consider each in turn.

## I. Common Scheme or Plan

¶19　Charges are part of a common scheme or plan "when the crimes involve a similar fact pattern and proximity in time." *State v. Balfour*, 2008 UT App 410, ¶ 20, 198 P.3d 471. After laying out these two requirements, we explain how Lim's conduct fell short of meeting them.

### A.　Similar Fact Pattern

¶20　A "parallel fact pattern in [multiple] incidents plainly demonstrates the existence of a calculated plan." *State v. Lee*, 831 P.2d 114, 118 (Utah Ct. App. 1992). But "to be classified as a common plan or scheme it is not necessary for the crimes to have been perpetrated in an absolutely identical manner, so long as the court perceives a visual connection between the two crimes." *Id.* at 117 (cleaned up); *accord Balfour*, 2008 UT App 410, ¶ 20.

¶21　In *Balfour*, a defendant was charged with four counts of forcible sexual abuse in a single information, three of which were for touching the breasts of three women who had come to his office, all on the same day. 2008 UT App 410, ¶¶ 2–4, 7. The other count was related to the defendant going to another woman's house—about sixteen months earlier—removing his pants and rubbing his penis against the woman's vagina over her clothing in an act of simulated intercourse. *Id.* ¶ 6. The trial court denied the defendant's motion to sever the four counts. *Id.* ¶ 10.

¶22    On interlocutory appeal, this court determined that the office counts were properly joined because "the three alleged crimes occurred within the same calendar day and [because] the circumstances surrounding each incident [were] strikingly similar." *Id.* ¶¶ 1, 21, 25. But the remaining count involving simulated intercourse was not properly joined. *Id.* ¶ 28. This court noted that not only did this count relate to conduct that had occurred sixteen months earlier, but it also took place at the woman's home and involved touching a different body part. *Id.* ¶ 30. In the interest of "assuring the defendant a fair trial," this court held "that the trial court exceeded its discretion in denying [the defendant's] motion to sever [the dissimilar] count." *Id.* ¶ 31.

¶23    *State v. Hildreth*, 2010 UT App 209, 238 P.3d 444, involved the joinder of six counts of forcible sexual abuse perpetrated against four different women by a chiropractor during treatment. *Id.* ¶ 2. All the incidents happened under the guise of administering chiropractic treatment and while the women were alone with the defendant. *Id.* ¶¶ 5–21. The first woman testified that the defendant lifted her hospital gown and touched her bare breast, pulled her pants down and touched her pubic bone, and (on a subsequent visit) reached under her gown and touched her bare breast. *Id.* ¶¶ 5–6. The second woman testified that the defendant put his hand under her shirt and bra and touched her breast "skin to skin" and (in a subsequent visit) opened her gown to expose "her naked body from the waist down" and massaged her hip and buttocks, also touching her pelvic area. *Id.* ¶¶ 7–8. The third woman testified that the defendant, while giving her a massage, twice "brushed over" her crotch area, slid his finger under her underwear and touched her labia, and lifted the sheet covering her, exposing her bare breasts. *Id.* ¶¶ 10–11 (cleaned up). The fourth woman, who worked as a receptionist for the defendant, told him that she had a vaginal infection. *Id.* ¶¶ 13–14. The woman allowed the defendant to examine her and apply a gel to her vaginal area. *Id.* ¶ 15. On a subsequent visit, he inserted his hand "more fully into her vagina" and rubbed for a long time. *Id.* ¶ 16. The defendant also began "flicking her nipple." *Id.* ¶ 17

(cleaned up). And on a follow-up visit, the defendant engaged in nearly identical—though much more invasive—touching. *Id.* ¶ 19.

¶24    The trial court denied the defendant's motion to sever, noting that the evidence as to each woman would be admissible at separate trials under rule 404(b) to show motive, mental state, plan, absence of mistake, or lack of accident. *Id.* ¶ 3. The court also noted that the conduct for each count (1) involved a defendant who "exploited a position of trust as a chiropractor," (2) occurred under the guise of chiropractic care, and (3) happened in a clinical setting. *Id.* (cleaned up).

¶25    Despite the relatively similar circumstances under which each incident of abuse occurred, this court concluded that "the trial court erred in denying [the defendant's] motion to sever because the charges were neither connected in their commission nor part of a common scheme or plan." *Id.* ¶ 31. This court observed,

> Aside from the fact that [the defendant] was all of the women's chiropractor and that all of the conduct occurred during the course of treatment while the women were alone with him, there are too many variations in the circumstances and conduct to conclude that there is a parallel fact pattern that plainly demonstrates the existence of a calculated plan.

*Id.* ¶ 36 (cleaned up). Specifically, this court pointed out that the "incidents involved different body parts, different levels of undress and possibly unnecessary exposure, and different types of touching—from light brushing and massage to vigorous rubbing and actual penetration." *Id.* These differences, this court asserted, prevented it from "say[ing] that there [were] striking similarities in [the defendant's] conduct with each woman." *Id.*

### B.    Proximity in Time

¶26    A "common scheme or plan" exists "when the crimes involve a similar fact pattern and proximity in time." *Balfour*, 2008 UT App 410, ¶ 20 (cleaned up). In other words, "factual similarities should be viewed in light of their temporal proximity to one another." *Hildreth*, 2010 UT App 209, ¶ 34. Thus, for joinder to be proper, there must be both factual similarities *and* temporal proximity. And our case law on temporal proximity in the joinder context is nowhere near as expansive as the State suggests (i.e., allowing joinder even when several years or more pass between separate incidents). A span of five days is close enough—along with other similarities—to support joinder. *See State v. Lee*, 831 P.2d 114, 118 (Utah Ct. App. 1992). But conduct involving one victim that "occurred a full three years before the conduct relating to" a different victim and "over two years prior to the conduct involving" two other victims "was clearly not a part of a common scheme or plan." *Hildreth*, 2010 UT App 209, ¶ 37 n.10. Sixteen months—along with certain dissimilarities—is also too long for a common scheme or plan. *Balfour*, 2008 UT App 410, ¶ 30. And several months was too long in a case involving nearly identical rapes of two different victims. *State v. Gotfrey*, 598 P.2d 1325, 1327–28 (Utah 1979).

¶27    Citing *State v. Jimenez*, 2013 UT App 76, 299 P.3d 1158 (per curiam), and *State v. Hattrich*, 2013 UT App 177, 317 P.3d 433, the State asserts that this court has "affirmed the joinder of offenses that were . . . separated by significant periods exceeding the time-gap in this case." But *Jimenez* does not specify any time gap between the charged offenses; rather, it involved acts of sexual "abuse of three siblings over more than a decade." 2013 UT App 76, ¶¶ 4, 7. In no place does *Jimenez* indicate the length of time between the individual incidents of abuse. And *Hattrich* is much the same in that it involved twenty-five counts of various types of sexual victimization of five juveniles that occurred from 1994 to 1999. *See* 2013 UT App 177, ¶¶ 2, 19. Like *Jimenez*, *Hattrich* does not indicate the length of time between incidents. On the contrary, it states that the abuse of three of the victims "was occurring

simultaneously" over a three-year period. *Id.* ¶ 21 n.3 (cleaned up).

C.      Lim's Conduct as a Common Scheme or Plan

¶28    Here, the district court exceeded its discretion in joining the three charged incidents of alleged sexual abuse because they did not meet the requirements of a common scheme or plan.

¶29    First, the alleged abuse in the three incidents is too dissimilar to qualify for joinder. The difference between the first two incidents and the third is obvious in that the first two incidents involved an entirely distinct part of the body—resulting in two charges of object rape—from the third incident, which resulted in a charge of forcible sexual abuse. *See Hildreth*, 2010 UT App 209, ¶ 36 (determining that incidents involving "different body parts" and "different types of touching" prevented the court from finding that there were "striking similarities" in a defendant's conduct with different women).

¶30    And regarding all three incidents, aside from the fact that Lim was the nurse assigned to all three women and that all the "conduct occurred during the course of treatment while the women were alone with him, there are too many variations in the circumstances and conduct to conclude that there is a parallel fact pattern that plainly demonstrates the existence of a calculated plan." *See id.* (cleaned up). As in *Hildreth*, most of the striking similarities the State homes in on consist of similarities of circumstance (viz., a female patient suffering from a serious medical issue lying in a hospital bed and on pain medication) rather than similarities in Lim's conduct (viz., the calculated scheme Lim allegedly employed to touch the prohibited body parts). Without more (e.g., greater temporal proximity or

additional parallel conduct by Lim), touching a prohibited body part is simply insufficient to establish a common scheme or plan.[7]

¶31    Second, the lack of temporal proximity among the incidents also prevents them from being part of a common scheme or plan. The three charges related to the separate incidents that took place over the course of nearly seven years—from January 12, 2009, until December 31, 2015, with the interval between the first two incidents being just over five years and the interval between the second and third incidents being a week shy of twenty-three months. Our case law does not allow for such an expansive view of temporal proximity. Even the nearly twenty-three months between the second and third incidents lacks support as an acceptable term to establish temporal proximity. As discussed above, the cases cited by the State to argue joinder is acceptable even with such lengthy gaps in time as present here do not support the conclusions the State advances. Relatively frequent abuse spread out over a period of five or ten years is not the same as three distinct incidents of abuse separated respectively by over five years and nearly two years. *See Jimenez*, 2013 UT App 76, ¶¶ 4, 7; *Hattrich*, 2013 UT App 177, ¶¶ 2, 19, 21 & n.3.

¶32    In sum, "we are impelled to conclude that the separate and different charges" of sexual assault of the three patients "are not of such similarity in character and circumstances of commission that, considering fairness" to Lim, they should have been joined under Utah Code section 77-8a-1. *See Gotfrey*, 598 P.2d at 1328.

---

7. Indeed, given the striking similarity of the fact patterns, the outcome of this case is largely dictated by *State v. Hildreth*, 2010 UT App 209, 238 P.3d 444. Because the State has not engaged in the analysis required to ask us to overturn *Hildreth*, we feel bound by its analysis in arriving at the outcome here.

## II. Prejudice

¶33 Even when severance should have been granted because the charged incidents fell short of constituting a common scheme or plan, as is the case here, a defendant must still show prejudice to prevail. *State v. Calliham*, 2002 UT 86, ¶ 34, 55 P.3d 573 ("Any error in denying severance will be deemed harmless unless [a] defendant can establish a reasonable likelihood of a more favorable outcome if the court had granted a severance." (cleaned up)); *see also* Utah R. Crim. P. 30 (a) ("Any error, defect, irregularity or variance which does not affect the substantial rights of a party shall be disregarded."). Indeed, prejudice must also be evaluated even when joinder is proper under the common scheme or plan rubric. *See* Utah Code Ann. § 77-8a-1(4)(a) (LexisNexis 2017) ("If the court finds a defendant . . . is prejudiced by a joinder of offenses . . . , the court shall order an election of separate trials of separate counts . . . ."); *see also State v. Burke*, 2011 UT App 168, ¶ 25, 256 P.3d 1102 ("Even if offenses are properly joined, severance may nonetheless be required to prevent prejudice to the defendant."). And

> care must be taken that the [joinder] statute is not misused to deprive an accused of a fair trial upon an offense by joining different offenses so that evidence concerning charges unrelated in time and nature, which would normally not be admissible upon a trial, could be admitted as to the multiple offenses in an effort to stigmatize the defendant and thus make it questionable that the jury would give a fair and dispassionate consideration to the evidence.

*State v. Gotfrey*, 598 P.2d 1325, 1328 (Utah 1979). Consequently, we proceed to analyze whether the district court exceeded its discretion in determining that Lim was not prejudiced by the joinder, and we conclude that it did.

¶34 For a joinder to stand, it must "meet the prejudice prong of section 77-8a-1." *See State v. Balfour*, 2008 UT App 410, ¶ 21, 198

P.3d 471. "In analyzing the prejudice prong, the trial court must determine whether evidence of the other crime would have been admissible in a separate trial." *Id.* (cleaned up). That analysis (viz., the admissibility of the other acts) is governed by rule 404 of the Utah Rules of Evidence. *See id.* And "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in conformity with the character." Utah R. Evid. 404(b)(1). But other-act "evidence may be admissible for another purpose, such as proving . . . absence of mistake." *Id.* R. 404(b)(2).

¶35 However, even if the evidence is admitted for a "proper, noncharacter purpose" and the evidence is "relevant to the offense being prosecuted," that "evidence of other crimes, wrongs, or acts must be admissible under rule 403," *Balfour*, 2008 UT App 410, ¶ 22, which excludes "relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice," *see* Utah R. Evid. 403.[8] While "a proper rule 403

---

8. We are cognizant that the prejudice analysis for joinder is usually conducted under the "substantially outweigh[ing]" language found in rule 403 of the Utah Rules of Evidence. *See, e.g.,* *State v. Balfour*, 2008 UT App 410, ¶ 22, 198 P.3d 471. But the text of the joinder statute does not appear to call for such a high threshold. Rather, it requires only that a court order "separate trials of separate counts" if a defendant "is prejudiced by a joinder." *See* Utah Code Ann. § 77-8a-1(4)(a) (LexisNexis 2017). We acknowledge that "the burden of demonstrating prejudice is a difficult one, and the ruling of the trial judge will rarely be disturbed upon review. The defendant must show something more than the fact that a separate trial might offer him a better chance of acquittal." *State v. Reece*, 2015 UT 45, ¶ 73, 349 P.3d 712 (cleaned up); *see also State v. Benson*, 2014 UT App 92, ¶ 18, 325 P.3d 855 (stating that "generalized but unanalyzed assertions" of "inherent prejudicial impact" resulting from joinder "fall short of demonstrating trial court error" (cleaned up)). However, as this case does not turn on the level of prejudice present, we leave for

(continued…)

analysis for rule 404(b)" looks first to "the language of rule 403, . . . to the extent the court finds it helpful to consider a factor set forth in *Shickles*[9]—or any other factor—it may do so." *State v. Ring*, 2018 UT 19, ¶ 23, 424 P.3d 845 (cleaned up).

¶36    Thus, if Lim shows that the evidence of the three charged crimes would not have been admissible at separate trials because its probative value was substantially outweighed by the danger of unfair prejudice, he can establish that the district court exceeded its discretion when it denied his motion to sever. We

---

another day the question of whether, under the joinder statute, any prejudice must substantially outweigh the value of adjudicating the cases together.

9. The *Shickles* factors are "the strength of the evidence as to the commission of the other crime, the similarities between the crimes, the interval of time that has elapsed between the crimes, the need for the evidence, [and] the efficacy of alternative proof." *State v. Shickles*, 760 P.2d 291, 295–96 (Utah 1988) (cleaned up), *abrogated on other grounds by State v. Doporto*, 935 P.2d 484 (Utah 1997). We note that over the last few years, the strict application of these factors has been abandoned. *See State v. Fullerton*, 2018 UT 49, ¶ 23 n.5, 428 P.3d 1052. Our supreme court has stated "that while some of the *Shickles* factors may be helpful in assessing the probative value of the evidence in one context, they may not be helpful in another." *Id.* (cleaned up). Rather, in assessing prejudice, "courts are bound by the text of rule 403, [and] not the limited list of considerations outlined in *Shickles*." *Id.* (cleaned up). Moreover, "it is inappropriate for a district court to ever consider whether evidence will lead a jury to 'overmastering hostility'"— which was the last of the original *Shickles* factors—because the "language of rule 403 requires only that evidence not lead to unfair prejudice" and "[o]vermastering hostility is both a stricter and looser metric by which to judge evidence under rule 403." *State v. Cuttler*, 2015 UT 95, ¶ 20, 367 P.3d 981; *see also Shickles*, 760 P.2d at 295–96 (listing the original *Shickles* factors).

conclude that he has made such a showing for the following reasons.

¶37    First, as we have already discussed, the lack of similarity and extensive time intervals separating the three incidents weigh against joinder and support a conclusion of prejudice. *See State v. Hildreth*, 2010 UT App 209, ¶ 44, 238 P.3d 444 (concluding that a joinder of conduct that lacked similarity and that was separated by lengthy intervals of time prejudiced a defendant).

¶38    Second, when considered in isolation, the strength of the State's evidence supporting each individual count was "relatively weak." *See id.* "There was no confession, no third-party eyewitnesses, and no physical evidence that [the three patients] had been sexually abused; the only direct evidence that abuse occurred was [the patients' testimonies]. Our supreme court has described convictions in such cases as not strongly supported by the record." *State v. Burnett*, 2018 UT App 80, ¶ 39, 427 P.3d 288 (cleaned up). This is not to say that Lim could not have been convicted on any one (or even all) of the counts had they been tried separately, but introducing evidence of all three allegations in the same proceeding prejudiced Lim by the cumulative bolstering effect that the combination had on the otherwise uncorroborated allegations. *See Hildreth*, 2010 UT App 209, ¶ 44 ("[C]umulative prior bad acts evidence may have the tendency to suggest a verdict on an improper, emotional basis.").

¶39    Finally—and perhaps most indicative of the State's objective in pursuing joinder and most damaging to the proposition that evidence of each count would be admissible at separate trials—we note that the manner in which the State connected the three allegations during closing argument, *see infra* ¶ 41, certainly suggests that the State was proffering the evidence not for a proper noncharacter purpose (viz., to show a lack of mistake) but to suggest propensity, *see State v. Lane*, 2019 UT App 86, ¶ 25, 444 P.3d 553 ("The way the evidence was presented at trial also supports our conclusion that the prior act evidence in this case presented a prejudicial propensity inference."); *see also*

*State v. Verde*, 2012 UT 60, ¶ 22, 296 P.3d 673 ("Fidelity to the integrity of the rule requires a careful evaluation of the true—and predominant—purpose of any evidence proffered under rule 404(b). Thus, if proof of [the noncharacter purpose] is merely a ruse, and the real effect of prior misconduct evidence is to suggest a defendant's action in conformity with alleged bad character, the ruse is insufficient and the evidence should not be admitted."), *abrogated on other grounds by State v. Thornton*, 2017 UT 9, 391 P.3d 1016.

¶40   "In conducting a rule 403 balancing with regard to rule 404(b) evidence, the evidence's non-character purpose should be weighed on the probative value side of the ledger, while the evidence's value as propensity evidence should be weighed on the prejudice side of the ledger." *State v. Fredrick*, 2019 UT App 152, ¶ 45, 450 P.3d 1154 (cleaned up). Here, the potential non-character purposes are rather weak and difficult to discern while the potential propensity inferences stand out. The State advances the argument that all three charges would have been separately admissible for a "proper noncharacter purpose under rule 404(b) of showing lack of mistake or accident." Specifically, the State argues that evidence of the three incidents would be admissible to refute Lim's claim that the three patients were "mistaken" or "confused and disoriented due to side effects of their medication." But as our supreme court recently clarified, where other-acts evidence is proffered to assist the jury in evaluating a witness's version of the events, "there is little separating the impermissible inference from the permissible one." *See State v. Richins*, 2021 UT 50, ¶ 104, 496 P.3d 158. Admitting similar-act evidence in this context could "permit the jury to infer" that the three patients correctly reported the inappropriate sexual touching because Lim "was accused of doing the same thing before." *Id.* Thus, the "risk of the jury making a character-based inference substantially outweigh[ed] the probative value of the other-acts evidence under these circumstances." *Id.*

¶41   That the State was in fact advancing a character purpose in advocating joinder was made clear in its closing argument. There,

the State repeatedly implied—and perhaps explicitly stated—that Lim had a propensity to sexually abuse vulnerable patients. The prosecutor stated that Lim's "pattern" of abuse started in 2009 and that Lim was charged because he abused patients "again and again and again." The prosecutor went on to describe Lim's "pattern" of abuse three more times and to state that Lim abused the patients "again" at least four more times. By making this argument, the State was inviting the jury to draw an impermissible propensity inference from this evidence.

¶42   Put succinctly, in analyzing whether prejudice proceeds from joinder, a court "must determine whether evidence of the other crime would have been admissible in a separate trial," *Balfour*, 2008 UT App 410, ¶ 21 (cleaned up), and evidence of Lim's sexual abuse of two other patients to show that he abused a third would not have been admitted because, as we explained above, the probative value of the evidence of the separate incidents was substantially outweighed by the danger of unfair prejudice, *see* Utah R. Evid. 403. Allowing the jury to learn that Lim was accused of sexual abuse of three different patients at different times over a period of nearly seven years, with substantial gaps between alleged instances of abuse, permitted it to draw an improper propensity inference that Lim was the kind of person inclined to sexually abuse women. We can discern no proper non-character purpose for the admission of the separate acts. And thus, even if "we are missing some subtle distinction between the State's proffered purposes and the forbidden propensity inference," any such distinction was likely "lost on [the] lay jury." *See State v. Gallegos*, 2020 UT App 162, ¶ 42, 479 P.3d 631. Therefore, the evidence of the separate acts had "little legitimate probative value" but came "laden with a substantial risk of unfair prejudice." *See id.*

¶43   Thus, for these reasons, we conclude that, in addition to not meeting the common scheme or plan prong of the joinder statute, the district court exceeded its discretion in determining that Lim was not prejudiced by the joinder of the three offenses. *See* Utah Code Ann. § 77-8a-1(4)(a) (Lexis Nexis 2017).

CONCLUSION

¶44    We conclude that the district court exceeded its discretion in denying Lim's motion to sever the three charged counts. They were not part of a common scheme or plan, and joining them was unfairly prejudicial.

¶45    Reversed and remanded.

———————